The **STUDENT COALITION FOR GAY RIGHTS, an unincorporated association, Edwin Guzman, Individually and as President of the Student Coalition for Gay Rights, Samuel T. Helton, Individually and as Treasurer of the Student Coalition for Gay Rights, and William H. Dannenmaier, Individually and as a member of the Student Coalition for Gay Rights, Plaintiffs,**

v.

**AUSTIN PEAY STATE UNIVERSITY, Roy S. Nicks, Robert O. Riggs, Charles N. Boehms, the State Board of Regents, Lamar Alexander, as Chairman of the State Board of Regents, Claude C. Bond, J. C. Eoff, Jr., and David V. White, Individually and in their official capacities as members of the Student Life Committee of the State Board of Regents, Defendants.**

No. 79–3430.

United States District Court, M. D. Tennessee, Nashville Division.

Oct. 12, 1979.

Gary E. Crawford, James Blumstein, Nashville, Tenn., for plaintiffs.

William M. Leech, Jr., Atty. Gen., R. Stephen Doughty, Asst. Atty. Gen., Nashville, Tenn., for defendants.

## MEMORANDUM

WISEMAN, District Judge.

Plaintiffs in this action are the Student Coalition for Gay Rights (Coalition), an unincorporated association of students at Aus-

tin Peay State University, and certain of its officers and members, Edwin Guzman, Samuel T. Helton, and William H. Dannenmaier.

Defendants are Austin Peay State University (APSU), the State Board of Regents (Board), Roy S. Nicks, individually and as Chancellor of the State University and Community College System of Tennessee, Robert O. Riggs, individually and as President of APSU, Charles N. Boehms, individually and as Vice President for Student Affairs of APSU, Governor Lamar Alexander, as Chairman of the Board, and Claude C. Bond, J. C. Eoff, Jr., and David V. White, individually and in their official capacities as members of the Student Life Committee of the State Board of Regents.

The complaint alleges violations of 42 U.S.C. §§ 1983, 1985(2), 1986, and the First and Fourteenth Amendments to the United States Constitution. Jurisdiction of the Court is invoked under 28 U.S.C. § 1343. Relief sought is in the form of (1) a declaration that the Coalition is entitled to University recognition and consequent University perquisites; (2) a preliminary and permanent injunction against defendants prohibiting them from denying University recognition and privileges to the Coalition on the same basis as other recognized student organizations; (3) compensatory and punitive damages; (4) costs and attorney fees pursuant to 42 U.S.C. § 1988; and (5) general relief.

■ Defendants, APSU and Board, move for dismissal as to them upon the ground that they are not "persons" subject to suit under 42 U.S.C. §§ 1983, 1985, and 1986. This position is correct and the suit will be dismissed as to these two defendants.[1] *Ala-*

1. Tennessee Code Annotated § 49–3236 provides:

There is hereby established a state university and community college system to be composed of Austin Peay State University, East Tennessee State University, Memphis State University, Middle Tennessee State University, Tennessee State University, Tennessee Technological University, Cleveland State Community College, Columbia State Community College, Dyersburg State Community

College, Jackson State Community College, Motlow State Community College, Roane State Community College, Shelby State Community College, Volunteer State Community College, Walters State Community College, Chattanooga State Technical Community College, and other community colleges which may be established. The government, management and control of the state university and community college system shall be vest-

*bama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (§ 1983); *Ohio Inns, Inc. v. Nye,* 542 F.2d 673 (6th Cir. 1976) (§ 1985); *Jordan v. Fitzharris,* 257 F.Supp. 674 (N.D.Cal.1966) (§ 1986).

This matter is now before the Court on the application for a preliminary injunction. The parties have stipulated four volumes constituting the record developed in a hearing before a hearing officer appointed by Chancellor Roy Nicks, as well as other matters.[2] The Court heard oral arguments from counsel and no additional proof was ·offered. The following summary is taken from the stipulated record and briefs of the parties.

## HISTORY OF THE CASE

In the fall of 1978, certain APSU students, including plaintiffs Guzman, Helton, and Dannenmaier, organized the Coalition and filed an application with the Student Government Association ("SGA") for recognition of it as a student organization. Recognition carries with it certain rights (including use of APSU facilities) that are not given to non-recognized student organizations.

The SGA approved the Coalition's application for recognition by a vote of 25–1. On or about December 1, 1978, the application was submitted to Vice President for Student Affairs, Charles N. Boehms, for approval, as required by APSU regulations. Defendants admit that the Coalition had complied with all procedural and technical requirements of the University (Boehms, Vol. I:86) and the Board of Regents (Boehms, Vol. II:26) for recognition of student organizations. He declined to recognize the organization solely for the substantive reasons set out in his letter of January 31, 1979, to Student Government President, David Mason, (Vol. III, Attachment 2 to Exhibit 17) and in his testimony. These reasons were as follows:

a. Recognition would give credibility to homosexual behavior and tend to expand violations of state law prohibiting homosexual behavior.

b. Recognition may lead to increased personal and psychological stress for persons who may be troubled about their sexual identity.

c. Recognition would not be consistent with the educational goals of the University.

d. Concern for how the community outside the University might react if the Coalition were recognized.

(Vol. III, Exhibit 17, Attachment 2; Boehms, Vol. I:66, 86–88).

On February 6, 1979, Mr. Richard Lewis, President of the Coalition, appealed Dr. Boehms' decision to President Robert O. Riggs. On February 8, 1979, President Riggs refused to extend recognition to the Coalition. His reasons are stated in his letters of that date to Mr. Richard Lewis (Vol. III, Exhibit 17, Attachment 5) and to Mr. David Mason (Vol. III, Exhibit 17, Attachment 4). The following statement from the letter to Mr. Lewis summarizes his reasoning:

It is my judgment that the Student Coalition for Gay Rights implicitly endorses homosexuality. Sexual activity with another of the same sex is unlawful in the State of Tennessee; moreover, such activity is contrary to the Judeo-Christian ethic which undergirds our community, our State, and our nation.

There are ample opportunities for students and faculty in the classroom and through independent inquiry to examine freely the social and psychological structures and nuances of our society. . . .

The Student Coalition for Gay Rights has no place at Austin Peay State University. The purposes of this group are contrary to the mission of this institution.

ed in a board of regents hereinafter called the "board."

**2.** The record is in four volumes: "Exhibit 18" is a transcription of the meeting of the Student

Life Committee of the Board; the deposition of David Mason is also filed. Reference herein to the record will be to volume by Roman numeral I–IV.

The Coalition appealed Riggs' decision to Chancellor Roy S. Nicks. A hearing officer was appointed and a factfinding hearing ("Hearing") was held on May 9–10, 1979. Chancellor Nicks was not present. Both the Coalition and APSU were represented by counsel. APSU called Dr. Harvey Reese, a non-board-certified psychiatrist in private practice; Dr. Garland Blair, head of the APSU Psychology Department; and defendant Boehms, Vice-President of Student Affairs. The Coalition called Mr. Richard Lewis, an APSU student and the Coalition's President; Mr. Glen Carter, a faculty member in the APSU Sociology Department and the group's faculty adviser; Dr. Thomas Pinckney, a member of the APSU Political Science Department; Dr. Embry McKee, Associate Professor of Psychiatry at Vanderbilt University Medical School and Director of the Vanderbilt Adult Psychiatric Outpatient Clinic; Dr. Howard B. Roback, Associate Professor of Psychology at Vanderbilt University; William Riley, Director of Student Life at the University of Missouri—Columbia (Vol. III, Exhibit 5); and Dr. Judd Marmor, Professor of Psychiatry at the University of Southern California School of Medicine (Vol. III, Substitute Exhibit 6). The deposition of David Mason, SGA President, was subsequently taken.

On July 16, 1979, Chancellor Nicks notified the Coalition that he refused to recognize it (Vol. IV:7/16/79 Nicks' letter). Chancellor Nicks made certain conclusions, purportedly based on the record of the Hearing.[3]

The Coalition appealed Nicks' decision to the Student Life Committee of the Board to which the Board had previously given the responsibility of disposing of any appeal that might result from an adverse decision by the Chancellor. On August 13, 1979, by a vote of 3–2 (defendants Bond, Eoff, and White constituting the majority), the Committee sent the issue back to Chancellor Nicks for reconsideration, with the proviso

---

3. The findings of Chancellor Nicks were:

A. Recognition of the SCGR would constitute both actual and implicit approval of the purposes of the organization—the promotion of homosexual behavior as acceptable conduct—and would be construed by the student body and the surrounding community as approval of homosexuality.

B. Recognition of the SCGR would have a long-term effect of causing an increase in homosexual behavior both on campus and in the surrounding community. Recognition would also have immediate effects on students with sexual identity problems, by encouraging such persons to experiment with homosexual behavior, and would have long-term effects of increasing the acceptance of homosexuality on campus and in the surrounding community, which would cause a progressive increase in the number of younger persons who engage in such behavior.

C. Recognition of the SCGR would tend to reinforce the personal identities of homosexual members and perpetuate and expand homosexual behavior.

D. Recognition of the SCGR would result in homosexuals counseling other students who are homosexuals or who are suffering from gender identity problems.

E. The SCGR will in fact promote homosexuality, in that it will advocate social acceptance of homosexuality; it will advocate changes in laws that make homosexual behavior a crime; it promotes and sponsors social activities, such as dances, where homosexuals will meet each other; and its members will promote the homosexual lifestyle to other students; and the very essence of the SCGR is promotional of homosexuality in nature.

F. Homosexual behavior constitutes a crime against nature in violation of T.C.A. § 39–707.

G. There is a substantially greater incidence of suicides and attempted suicides among homosexuals as compared to heterosexuals.

H. Homosexuality is a psychologically treatable condition.

I. Male homosexuals are generally quite promiscuous in their sexual behavior, and their drive for homosexual contacts often becomes enormously compulsive in nature.

J. The statement of purpose of the SCGR as set forth in its proposed constitution is vague and would not serve to limit any of the activities of the organization, and would preclude any evaluation by APSU as to whether the SCGR is legally fulfilling its mission.

K. The SCGR has continuously varied its statements of purposes since its inception, and in all probability will continue to modify its stated purposes from time to time if it is recognized.

L. The SCGR has failed to operate in accordance with its proposed charter, and has failed to submit its revised statements of purpose and its new system of governance to APSU for approval.

M. The members of the SCGR have, on an individual basis, in effect received or had the opportunity to receive all of the major benefits of a recognized student organization at APSU.

that the Committee approved Chancellor Nicks' final decision, whatever it might be (Vol. III, Exhibit 18).

On August 23, 1979, Chancellor Nicks reaffirmed his previous action not to recognize the Coalition (Vol. IV:8/23/79 Nicks' letter).

## THE ISSUES

Defendants admit the right of the Coalition to exist, its First Amendment right to freedom of association and to advocate its position as to the acceptability of alternative lifestyles, and to advocate revision of laws penalizing homosexuality.[4] The issue arises only as to *recognition* of the Coalition

by the University and the incidents of such recognition. The plaintiffs insist that denial of recognition amounts to a significant constriction of access to University facilities and means of communication and, therefore, burdens or abridges their right of association. Defendants insist that recognition would carry with it the potential perception of University approbation of the organization, its goals, and even approval of homosexual conduct. They say that recognition would result in an increased incidence of homosexual conduct in violation of State criminal law.[5]

■ Issue is thus joined on these questions:

---

4. Article II of the Constitution of the Coalition provides: "This organization shall work to promote human rights and to encourage a better understanding of alternate lifestyles." ("Alternate lifestyles" is stipulated to refer to various lifestyles of homosexual persons). Article IX of the same Constitution provides: "We support the constitution of the United States, the State of Tennessee and the rules and regulations of Austin Peay State University. However, we encourage the introduction of litigation within our existing systems that will bring about and maintain equal rights and responsibilities for all Americans." (Vol. III, Exhibit 17).

An elaboration of this broad statement of purpose was adopted by the Coalition on April 11, 1979:

The Student Coalition for Gay Rights is open to all students of Austin Peay State University, whether gay or non-gay, who share its goals. The Coalition's purposes are as follows:

1. To encourage communication between gay and non-gay members of the University community.

2. To educate the University and the surrounding community on the meaning of being gay and to dispel the false stereotypes of gay people that now exist.

3. To organize effective political action in support of legislation protecting the civil rights of gay people, including equal opportunity to jobs and housing.

4. To engender a rational debate concerning sodomy laws and other statutes that proscribe private sexual conduct between consenting adults without ethical, social or political justification, and to urge their repeal.

As an educational and political action organization, the Coalition does not advocate or promote violation of state statutes. Our goal is not to promote homosexuality or any other kind of sexual behavior but to promote understanding and equality for all people without

regard to their sexual orientation. We seek to effect our goals through compliance with the Constitution of the United States and the State of Tennessee, Tennessee statutory law and the rules and regulations of the University. (Vol. III, Exhibit 8).

5. Tennessee Code Annotated § 39–707 provides that "Crimes against nature, either with mankind or any beast, are punishable by imprisonment in the penitentiary not less than five (5) years nor more than fifteeen (15) years."

This statute has been interpreted to apply to sodomy, *per os* and *per anus. Stephens v. State,* 489 S.W.2d 542 (Tenn.Cr.App.1973), and fellatio, *Sherrill v. State,* 204 Tenn. 427, 321 S.W.2d 811 (1959).

Tennessee Code Annotated § 39–115 provides:

Whoever, by means of oral, written, or electronic communication, directly or through another, willfully solicits, commands, requests, or hires another to commit a criminal offense, or attempts to solicit, command, request, or hire another to commit a criminal offense, with the intent that the criminal offense solicited be committed is guilty of the offense of solicitation. It is no defense that the solicitation was unsuccessful and the crime solicited was not committed. It is no defense that the person solicited could not be guilty of the offense solicited, due to insanity, minority, or other lack of criminal responsibility or incapacity. It is no defense that the person solicited was unaware of the criminal nature of the conduct solicited. It is no defense that the person solicited is unable to commit the crime solicited because of a lack of capacity, status, or characteristic needed to commit the crime solicited, so long as the person soliciting or the person solicited believes that he or they have such capacity, status, or characteristic.

(1) Is the denial of recognition a significant abridgment of the plaintiffs' right of association?

(2) If so, are the defendants justified in so doing by the furtherance of a compelling state interest?

### NON–RECOGNITION AS AN ABRIDGMENT OF THE RIGHT OF ASSOCIATION

Benefits accruing to student organizations from receiving official recognition include the scheduling of campus facilities for meetings and activities, opportunity to lease a campus post office box in its name, privilege of posting notices and appropriate signs announcing activities, opportunity to apply for funds from Student Activity Fund, opportunity to be listed in Student Handbook and Yearbook, and opportunity to advertise events and activities in the University newspaper at the student organization rate. (Vol. III, Exhibit 14). On the other hand, non-recognition carries with it the restriction imposed by the stated policy of the Board:

"3. *General Policies on Student Organizations* (1) No student organization may carry on *any activity* on the campus of an institution unless official recognition has been granted by the institution."

(Vol. III, Exhibit 15) (emphasis supplied).

Chancellor Nicks seems to recognize that individual members of plaintiff organization may carry on activities on an individual basis and observes that certain privileges may have been extended on a *de facto* basis despite the prohibition set out above. Vol. IV: 8/23/79 Nicks' letter. Such *de facto* largesse of the University could obviously be withdrawn at any time pursuant to the stated policy of the Board which governs the University. The insistance upon the distinction between the sufferance of the sovereign and the exercise of a right is the raison d'etre of our Constitution. Chancellor Nicks' rationale in this regard withers in the light of the most cursory of principled examinations.

Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs. While the freedom of association is not explicitly set out in the Amendment, it has long been held to be implicit in the freedoms of speech, assembly, and petition. . . . There can be no doubt that denial of official recognition, without justification, to college organizations burdens or abridges that associational right.

*Healy v. James,* 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266, 279 (1972). (citations omitted).

A significant abridgment of plaintiffs' First Amendment rights is present in the facts presented here.

### JUSTIFICATION OF THE RESTRICTION

The more difficult question presented is whether the restriction is in furtherance of a compelling state interest. First Amendment rights are not absolute but may be restricted only "if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley v. Valeo,* 424 U.S. 1, 25, 96 S.Ct. 612, 638, 46 L.Ed.2d 659, 691 (1976). The "heavy burden" of demonstrating such a justification rests upon the defendants. *Healy v. James, supra. See also Law Students Research Council v. Wadmond,* 401 U.S. 154, 162–63, 91 S.Ct. 720, 726, 27 L.Ed.2d 749, 757–59 (1971). It is, therefore, necessary to scrutinize closely the justifications of denial by defendants and the factual foundation thereof.

These justifications may be grouped into the following assertions:

1. Recognition would constitute implicit approval by APSU of homosexuality as acceptable behavior. Even the promotion of the acceptability of homosexuality is contrary to the educational goals of the University. (See Sec. 4(3), Vol. III, Exhibit 15.)

2. Recognition would result in increased homosexual activity, both through reinforcement of present homosexuals and encouragement of potential future homosexuals.

3. Homosexuality is contrary to the law of Tennessee and its promotion is contrary to law and inimical to society.

The assertions will be treated *seriatim.*

### 1. *University approval implicit in recognition.*

A university community, to varying degrees, is a microcosm of the heterogeneous society in which we live. Individuals and associations of individuals on a university campus represent opposite ends, and probably most shades between the ends, of the spectrum of ideas—religious, political, moral, and philosophical. Recognition by APSU of an organization is neither explicit nor implicit approval of the organization, its goals, or purposes. To insist otherwise would involve the University in impossible contradictions. Would not the University "recognize" both the Student Christian Association and the Jewish Student Organization, or even the Student Atheist Society? Would it grant recognition to the Jewish Defense League but deny it to the Palestinian Student Association? Would it recognize the American Nazi Party but deny recognition to the NAACP? What about Young Republicans versus Young Democrats? Approval or disapproval based upon explicit or implicit agreement with the content of the advocacy is contrary to the very core of a University's goal of eclectic examination, but more importantly to this dispute, cannot pass constitutional muster. The strength of this society lies in its willingness and ability to tolerate the expression of unpopular, even abhorrent, ideas. As Mr. Justice Black said, "I do not believe that it can be too often repeated that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish." *Communist Party v. S. A. C. Board,* 367 U.S. 1, 137, 81 S.Ct. 1357, 1431, 6 L.Ed.2d 625, 713 (1961) (Black, J., dissenting).

What the University *thinks* about the *advocacy* of homosexuality as an acceptable lifestyle, what the community or the Legislature might *think* about the University's action in this regard (even if such homogeneity of opinion were a practical possibility rather than the sheerest kind of conjecture), cannot serve as a justification for the abridgment of that advocacy. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 216 (1972).

### 2. *Recognition would increase homosexual activity.*

Neither is it a legitimate concern of the defendants that to permit organizational advocacy of homosexuality would somehow increase the incidence of homosexuality. Defendants rely heavily upon the testimony of Dr. Harvey Reese, Jr., psychiatrist, who opined that, although it would be impossible to predict the effect of recognition on the incidence of homosexuality, such recognition would allow the promotion of homosexuality and produce an atmosphere of legitimacy that would have an impact on attitudes of people on and off campus. (Vol. I, at 13–14).

Dr. Garland Blair, Chairman, Department of Psychology at APSU, testified that he thought the publicity attendant with recognition would increase the probability of homosexual behavior. He also expressed concern about the "position of the University in the community" if the organization were recognized. (Vol. I, at 46–47).

In contrast to these opinions, plaintiffs offered the affidavit of William Riley, Director of Student Life, University of Missouri at Columbia, in which he said that he had not found any evidence that recognition of gay rights groups increased homosexual conduct among students or had any other harmful effects. (Vol. I, at 108–09).

Similarly, in his affidavit, Dr. Martin S. Weinberg, Senior Research Sociologist, Institute for Sex Research, Indiana University, stated that there is no "empirical or historical basis" for supposing that the existence of gay rights organizations will increase homosexual conduct. (Vol. I, at 110).

Dr. Embry A. McKee, Associate Professor of Psychiatry, Vanderbilt University School of Medicine, testified that a gay rights organization would not create problems for people with gender identity disorders (Vol. II, at 39), and that such an organization would not increase homosexual behavior (Vol. II, at 42). Dr. McKee further testified that University recognition of or failure to recognize the gay rights group will not affect the incidence of homosexuality among students (Vol. II, at 50–51), nor will recognition have a detrimental influence on the student body (Vol. II, at 52).

Dr. Howard Roback, Ph.D., Professor in the Department of Psychiatry and Associate Professor in Department of Psychology, Vanderbilt University, essentially repeated Dr. McKee's testimony and added that part of the educational process should be to help students become more open and tolerant of differences. (Vol. II, at 80–81).

On the basis of this conflicting testimony, Chancellor Nicks (who did not observe the witnesses) made findings of fact that recognition would increase homosexual behavior.

Even if such a finding of fact were controlling of the disposition of this case on the issue of the existence of a compelling state purpose, then this Court would disagree with Chancellor Nicks. The experts offered by the plaintiffs had more impressive credentials, and their testimony was more persuasive. In the face of such contrasting opinions, defendants have not carried the "heavy burden" of *Healy v. James, supra,* and the long line of cases dealing with this precondition to First Amendment abridgment. *See, e. g., Buckley v. Valeo, supra,* 424 U.S. at 25, 96 S.Ct. at 637, 46 L.Ed.2d at 691; *Cousins v. Wigoda,* 419 U.S. 477, 489, 95 S.Ct. 541, 548, 42 L.Ed.2d 595, 604 (1975); *NAACP v. Button,* 371 U.S. 415, 438–39, 83 S.Ct. 328, 331, 9 L.Ed.2d 405, 421 (1963); *Bates v. Little Rock,* 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480, 486 (1960); *NAACP v. Alabama,* 357 U.S. 449, 463–64, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488, 1500–01 (1958).

But such a resolution of the testimony is *not* controlling of this issue. Here we are not dealing with conduct, but with the *advocacy of the acceptability* of conduct. Defendants fear the potential harm of ideas, of information, of "recognition." All are speech in their purest form. Protection of even potentially harmful speech is grounded in the belief "that our people, adequately informed, may be trusted to distinguish between the true and the false . . . .." *Viereck v. United States,* 318 U.S. 236, 251, 63 S.Ct. 561, 568, 87 L.Ed. 734, 743 (1942) (Black, J., dissenting). Denial of that choice substitutes paternalism for individual responsibility, Orwellian conformity for individual freedom.

3. *Homosexual conduct and incitement thereto are crimes under Tennessee law.*

Once again, the distinction must be drawn between speech and conduct. Nothing in the record indicates that plaintiffs have any intention to violate any law of Tennessee; every indication is to the contrary. Plaintiffs fully intend to voice their disagreement with the law and to advocate its revision or repeal. This is the quintessence of First Amendment exercise. Until the law is changed, APSU can vigorously enforce the sodomy laws of Tennessee and the prohibition against solicitation to commit sodomy, either against individual members of plaintiff organization or against the organization itself if it is found to be sponsoring such conduct now condemned as criminal. It may not abridge speech and association.

A preliminary injunction will issue in accordance with this opinion.