AN–TI CHAI, Plaintiff,

v.

MICHIGAN TECHNOLOGICAL UNIVER-
SITY, Dr. Raymond L. Smith, Individu-
ally and as President of Michigan Tech-
nological University; Dr. C. E. Mande-
ville, Individually and head of the De-
partment of Physics, Michigan Techno-
logical University; and Dr. Zane C. Mot-
teler, Individually and head of the De-
partment of Mathematics, Michigan
Technological University, Defendants.

Dr. C. E. MANDEVILLE, Cross-Plaintiff
and Plaintiff,

v.

MICHIGAN TECHNOLOGICAL UNIVER-
SITY and Dr. Raymond L. Smith, Indi-
vidually and as President of Michigan
Technological University, jointly and
severally, Cross-Defendants,

and

D. W. Stebbins, Individually and as Vice-
President of Academic Affairs of Michi-
gan Technological University; and Wil-
liam J. Powers, Individually and as Dean
of the College of Sciences and Arts at
Michigan Technological University,
jointly and severally, Defendants.

No. M76–62 CA.

United States District Court,
W. D. Michigan, N. D.

June 11, 1980.

John C. Evans, Jr., Ravenna, Ohio, for plaintiff.

Robert M. Vercruysse, Detroit, Mich., Peter H. Shumar, Donald W. Bays, Marquette, Mich., for defendants.

## OPINION AND ORDER

DOUGLAS W. HILLMAN, District Judge.

An-Ti Chai, a former, non-tenured professor at Michigan Technological University (hereinafter "MTU") brings suit against the University and three of its officers (in both their individual and official capacities) alleging discriminatory treatment and illegal termination of employment. One of the defendants, Dr. C. E. Mandeville, has cross-claimed against the University because of an alleged violation of due process arising out of Mandeville's demotion as head of the University's Department of Physics. As set out more specifically below, the University and the individual defendants move to dismiss the complaint and cross-claim. At issue are the questions who is a "person" for purposes of the civil right statutes, and whether the parties' terminations violated due process or equal protection. For the reasons that follow, I grant in part and deny in part defendants' motions.

I.

An-Ti Chai is a physicist hired by MTU on January 1, 1968, as a non-tenured professor in its Department of Physics. On September 25, 1972, plaintiff was transferred from the Department of Physics to the Department of Mathematics without his consent and without having been first consulted. Thereafter, on November 6, 1972, plaintiff was informed that he would be denied tenure. Chai was discharged by the University on June 16, 1973, and received his final paycheck on June 30, 1973.

On September 12, 1973, plaintiff filed a claim with the Michigan Civil Rights Commission and the Equal Employment Opportunity Commission (hereinafter "EEOC") alleging that the denial of tenure and subsequent termination resulted from discrimination based upon race, national origin, and ancestry in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, et seq). The Michigan Civil Rights Commission investigated the claim throughout the remainder of 1973 and all of 1974. However, no formal disposition was adopted by either the Michigan Agency or the EEOC, although on June 25, 1976, the EEOC did finally send plaintiff a "right to sue" letter. Plaintiff commenced this action July 30, 1976. Jurisdiction for the action arises under the Civil Rights Act of 1870 and 1871 (42 U.S.C. §§ 1981, 1983)[1] and Title VII.

---

1. 42 U.S.C. § 1981 reads as follows:

 § 1981. Equal rights under the law

 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Defendants named in plaintiff's action are MTU, Dr. Raymond L. Smith, in his individual and official capacity as President of Michigan Technological University, Dr. C. E. Mandeville, in his individual and official capacity as Head of the Department of Physics, and Dr. Zane C. Motteler, in his individual and official capacity as Head of the Department of Mathematics. Plaintiff requests a declaratory ruling pursuant to the Declaratory Judgment Act (28 U.S.C. §§ 2201 and 2202) that defendants discriminated against plaintiff by (1) transferring plaintiff from the Physics Department to the Mathematics Department even though other, non-tenured assistant professors with less seniority were available and who were better qualified to teach mathematics; (2) denying plaintiff tenure without cause; (3) urging plaintiff to resign his position as Assistant Professor; and (4) making derogatory remarks about plaintiff's ancestry. Plaintiff seeks preliminary[2] and permanent injunctive relief resulting in restoration of plaintiff's teaching position (including tenure), back pay, compensation for lost benefits, punitive damages and costs. A jury trial is demanded.

Defendants move to dismiss certain counts of the complaint. Specifically, defendants insist that the claims arising under

Sections 1981 and 1983 are barred by the statute of limitations.[3] Defendants further contend that plaintiff's demand for punitive damages and a jury trial should be denied because punitive damages and trial by jury are not permitted in lawsuits arising under Title VII. For the reasons that follow, I grant defendants' motion.

## Statute of Limitations

### A. Which State Statute Applies?

Since there is no specifically stated or otherwise relevant federal statute of limitations for actions arising under Sections 1981 and 1983, federal courts look to the most analogous state law in determining limitations periods. *See, Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1974); *Marlowe v. Fisher Body,* 489 F.2d 1057, 1063 (6th Cir. 1973). Plaintiff contends that because civil rights deprivations result in a wide variety of injuries to plaintiffs (e. g., harm to reputation, financial security, professional standing, etc.), the catch-all provision in Michigan's limitations statute, applying to "all other personal actions" (M.C.L.A. § 600.5813)[4], as opposed to the more specific state limitations law set out in M.C.L.A. § 600.5805[5], ought to apply. Plaintiff,

42 U.S.C. § 1983 reads as follows:

**§ 1983. Civil action for deprivation of rights**
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. Although plaintiff's complaint demands preliminary injunctive relief, no such motion was filed.

3. Defendants do not challenge the court's subject-matter jurisdiction over plaintiff's Title VII complaint.

4. M.C.L.A. § 600.5813 reads as follows:
Sec. 5813. All other personal actions shall be commenced within the period of 6 years after the claims accrue and not afterwards unless a different period is stated in the statutes.

5. The relevant Michigan statute is M.C.L.A. § 600.5805, which, until 1979, read:

Sec. 5805. No person may bring or maintain any action to recover damages for injuries to persons or property unless, after the claim first accrued to himself or to someone through whom he claims, he commences the action within the periods of time prescribed by this section.

(1) The period of limitations is 2 years for actions charging assault, battery, and false imprisonment.

(2) The period of limitations is 2 years for actions charging malicious prosecution.

(3) The period of limitations is 2 years for actions charging malpractice.

(4) The period of limitations is 2 years for actions against sheriffs charging misconduct or neglect of office by themselves or their deputies.

(5) The period of limitations is 2 years after the expiration of the year for which a constable was elected for actions based on his negligence or misconduct as constable.

(6) The period of limitations is 1 year for actions charging libel or slander.

(7) The period of limitations is 3 years for all other actions to recover damages for injuries to persons and property.

therefore, asserts that because suit was brought within six years of the alleged discrimination, as permitted under Section 5813 of the Michigan law, suit is timely.

■ However, in *EEOC v. Detroit Edison*, 515 F.2d 301 (6th Cir. 1975), *remanded on other grounds*, 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977), the Sixth Circuit held that M.C.L.A. § 600.5805(7), and not the catch-all provision embodied in Section 600.5813, applies to injuries arising under Section 1981. Under M.C.L.A. § 600.-5805(7), a three-year rather than a six-year limitations period applies.

This same three-year period is also employed in actions arising under Section 1983. *See, Geromette v. General Motors Corp.*, 609 F.2d 1200 (6th Cir. 1979); *Madison v. Wood*, 410 F.2d 564 (6th Cir. 1969). It is clear, therefore, that unless plaintiff has initiated suit within three years of accrual of his claim, the Section 1981 and 1983 aspects of his suit are barred.

*B. Tolling.*

Plaintiff contends, however, that even if a three-year statute of limitations applies to suits arising under Section 1981 and 1983, running of the statute of limitations is deferred because of plaintiff's having filed a claim with the EEOC. Since the present suit was brought within 90 days of his having received a "right to sue" letter, plaintiff argues, his suit is timely.

To the contrary, defendant contends that the filing of a complaint with the EEOC, prerequisite for maintaining a suit in Federal Courts under Title VII, does not delay the running of the statute of limitations as it applies to plaintiff's Section 1981 and 1983 charges. Because plaintiff did not timely file suit following accrual of his claims, defendant argues, those charges must now be dismissed.

The United States Supreme Court resolved this issue in the 1975 case, *Johnson v. Railway Express Agency, supra.* There,

the Court stated at 460–461 of 421 U.S. at 1720 of 95 S.Ct.:

Petitioner, and the United States as *amicus curiae*, concede as they must, the independence of the avenues of relief respectively available under Title VII and the older § 1981. See *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 416–417, n. 20 [88 S.Ct. 2186, 20 L.Ed.2d 1189] (1968). Further, it has been noted that the filing of a Title VII charge and resort to Title VII's administrative machinery are not prerequisites for the institution of a § 1981 action. *Long v. Ford Motor Co.*, 496 F.2d 500, 503–504 (CA6 1974); *Caldwell v. National Brewing Co.*, 443 F.2d 1044, 1046 (CA5 1971), cert. denied, 405 U.S. 916 [92 S.Ct. 931, 30 L.Ed.2d 785] (1972); *Young v. International Tel. & Tel. Co.*, 438 F.2d 757, 761–763 (CA3 1971). Cf. *Waters v. Wisconsin Steel Works*, 427 F.2d 476, 487 (CA7), cert. denied *sub nom. International Harvester Co. v. Waters*, 400 U.S. 911 [91 S.Ct. 437, 27 L.Ed.2d 151] (1970).

We are satisfied, also, that Congress did not expect that a § 1981 court action usually would be resorted to only upon completion of Title VII procedures and the Commission's efforts to obtain voluntary compliance. Conciliation and persuasion through the administrative process, to be sure, often constitute a desirable approach to settlement of disputes based on sensitive and emotional charges of invidious employment discrimination. We recognize, too, that the filing of a lawsuit might tend to deter efforts at conciliation, that lack of success in the legal action could weaken the Commission's efforts to induce voluntary compliance, and that a suit is privately oriented and narrow, rather than broad, in application, as successful conciliation tends to be. But these are the natural effects of the choice Congress has made available to the claimant by its conferring upon him independent administrative and judicial remedies. The choice is a valuable one.

Under some circumstances, the administrative route may be highly preferred over the litigatory; under others, the reverse may be true. We are disinclined, in the face of congressional emphasis upon the existence and independence of the two remedies, to infer any positive preference for one over the other, without a more definite expression in the legislation Congress has enacted, as, for example, a proscription of a § 1981 action while an EEOC claim is pending.

We generally conclude, therefore, that the remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent. With this base established, we turn to the limitation issue.

■ Moreover, although *Johnson* involved only a Section 1981 claim, I see no reason to treat Section 1983 claims differently in the context of this case. *Cf., Chambers v. Omaha Public School Dist.*, 536 F.2d 222, 228 (8th Cir. 1976). I therefore conclude that plaintiff has three years following accrual of his claim within which to bring his action, and the running of the statute of limitations is not tolled by plaintiff's filing with the EEOC.

## C. Accrual of Claim.

Plaintiff lastly contends that even if his Section 1981 and 1983 claims are not tolled because of having pursued an administrative remedy with the EEOC, and even if a three-year limitations period applies, plaintiff's claims are nevertheless timely because his claims did not "accrue" until the Fall of 1973, the period through which plaintiff was paid under his employment contract.

Defendants disagree. Instead, defendants contend that plaintiff's claims accrued upon his discharge from the University on June 16, 1973, or at the latest, upon plaintiff's receipt of $3,037.80 on June 30, 1973,

representing all of the money owed to the plaintiff by defendant University. Because suit was brought in July, 1976, defendants argue, the suit was initiated beyond the statutory period.

■ Plaintiff's claims against defendants accrue, at the latest, upon breach of the employment contract, and breach occurs upon discharge. 56 *C.J.S.* Master and Servant § 49, p. 443 (1948). This is the rule set out by the Michigan Supreme Court in *Reinardy v. Bruzzese*, 368 Mich. 688, 118 N.W.2d 952 (1962). I, therefore, conclude that plaintiff's Section 1981 and 1983 claims accrued by June 30, 1973, when plaintiff received his final paycheck from the University. Because plaintiff failed to bring suit within the three subsequent years, I conclude these claims are now untimely. I accordingly dismiss plaintiff's complaint, except as it alleges a claim under Title VII of the Civil Rights Act of 1964.[6]

## Trial by Jury; Compensatory and Punitive Relief Under Title VII

■ In his complaint, plaintiff further requests compensatory and punitive relief as well as a jury trial. These demands are not cognizable under Title VII. *See, Harrington v. Vandalia-Butler Board of Education*, 585 F.2d 192 (6th Cir. 1978), *cert. denied* 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979); *EEOC v. Detroit Edison, supra.* This is true because relief under Title VII is defined to be equitable, while plaintiff's punitive damages and jury demands are contrarily defined to be "legal". Consequently, plaintiff's requests for a non-equitable monetary award and for trial by jury are denied as not within the scope of Title VII's relief.

## II.

Following the initiation of this lawsuit by plaintiff Chai, Dr. C. E. Mandeville, one of

---

**6.** Plaintiff contends this court should not dismiss any count of his complaint based upon the statute of limitations because plaintiff's failure to bring suit in a timely fashion resulted from counsel's good faith, mistaken determination of when plaintiff's claims "accrued". While I

sympathize with plaintiff, a mistaken interpretation of the law is not a ground for suspending the running of the statute of limitations. 54 *C.J.S.* Limitations of Actions § 198 p. 202 (1948).

the defendants named in Chai's complaint, brought a cross-claim against MTU, Dr. Raymond L. Smith, in his individual and official capacity as President of Michigan Technological University, D. W. Stebbins, in his individual and official capacity as Vice-President of Academic Affairs at MTU, and William J. Powers, in his individual and official capacity as Dean of the College of Sciences and Arts. Mandeville's cross-claim arises out of his relationship with the defendants while cross-plaintiff was head of the Department of Physics.

Cross-plaintiff was a professor of physics at Kansas State University when he received a letter on March 6, 1967, from D. W. Stebbins of MTU, inviting him to apply for the position of Professor of Physics and Head of the Department of Physics. Cross-plaintiff alleges that he was informed by the defendants that the Physics Department was unspectacular and a head was being sought who would put pressure on the department staff to excel and to produce. Cross-plaintiff accepted this position after turning down a department chairmanship at the University of North Dakota, and began his employment on August 14, 1967. He received tenure as a professor on July 1, 1968.[7]

In the ensuing years, cross-plaintiff was increasingly pressured to resign as department head. Oriental members of the department charged cross-plaintiff with insensitivity, and, according to cross-plaintiff, threatened the school administration with lawsuits due to cross-plaintiff's alleged discriminatory practices. Particularly vocal was Dr. S. M. Lee, and it appears that the feud between Lee and Mandeville proved instrumental to cross-plaintiff's later demotion.

In 1973, cross-plaintiff sought to block Lee's tenure and promotion because cross-plaintiff insisted that Lee was unqualified. Cross-plaintiff asserts that defendants nevertheless granted tenure, and awarded Lee greater salary increases and other expenditures, solely because of Lee's race.

Cross-plaintiff further alleges that between 1973 and 1975, defendants solicited complaints by members of the Physics Department concerning cross-plaintiff's performance and that this solicitation was designed to create a basis upon which cross-plaintiff could be demoted. Cross-plaintiff asserts that defendants' purpose in seeking cross-plaintiff's demotion arose out of their fear that MTU would be sued by the Oriental members of the Physics Department because of race discrimination.

In September 1973, Dr. Raymond L. Smith, the University's President, asked cross-plaintiff to take a leave of absence so that the department might "cool down". Smith informed cross-plaintiff that he would be removed as department head if matters did not improve following cross-plaintiff's return in March of 1974. In fact, department morale remained poor, and the school administration consequently arranged for a department evaluation by a team of three physicists. Cross-plaintiff alleges that he was not permitted to meet with this advisory group, and that members of the team were friends of the defendants. The team ultimately unanimously concluded that cross-plaintiff should resign. Cross-plaintiff was notified of his impending demotion on December 11, 1974. He refused to resign, and so on January 10, 1975, cross-plaintiff was involuntarily removed as head of the Department of Physics at MTU.

Thereafter, cross-plaintiff was made Director of Special Projects for the University. He contends that while Director, he was told by defendants not to ask the United States Army Tank Automotive Research and Development Command for research funds because the organization was allegedly without any. Cross-plaintiff insists, however, that the defendants urged Dr. Lee to make a funding proposal to that group and that the defendants supplied Lee with travel funds and personal contacts for pursuing his proposal. Cross-plaintiff also asserts that Lee was made Director of the Keweenau Research Center over cross-plaintiff,

---

7. Cross-plaintiff notes that the "employee status form" issued October 25, 1969, lists cross-plaintiff as having received tenure for the position "Head/Professor".

that cross-plaintiff's rejection for this position was racially motivated, and that Dr. Lee's promotion made cross-plaintiff's position as Director of Special Projects meaningless.

Cross-plaintiff contends that his position as head of the Department of Physics was a permanent position and that it was wrongful for defendants to demote him without a hearing. Because cross-plaintiff had a property interest in the department headship, he asserts, failure to grant a hearing amounted to a violation of due process.

Defendants contend that cross-plaintiff is mistaken in believing that the department headship was a permanent position. In an accompanying affidavit, Dr. Smith refers to the faculty handbook provisions concerning tenure of administrative officers, in effect since 1957, which reads:

"C. *Administrative Officers*

1. Appointments to administrative posts do not carry tenure. Administrative officers continue in their posts as determined by the President and the Board of Control.

2. Administrative officers holding an academic rank are subject to the provisions applicable to such rank, only insofar as their nonadministrative faculty status is concerned."

Moreover, D. W. Stebbins, Vice-President of Academic Affairs of the University, further averred that nation-wide, department heads seldom, if ever, receive tenure, and that to his knowledge, no department head at MTU has ever received tenure. In fact, Stebbins argued that he told cross-plaintiff in 1967 that the Department of Physics' job opening was for a department headship as opposed to a department chairmanship, because department heads could be replaced at any time by the University administration, whereas chairmen could be replaced only upon vote of the department staff.

In reply, cross-plaintiff asserts that Stebbins expressly informed him that the department's headship was a permanent position, and insists that he was not informed otherwise until 1974. Moreover, cross-plaintiff asserts he was never shown a copy of the faculty handbook before moving to MTU. Further, that the handbook fails to list department headships as administrative positions, and that department heads are not listed as persons ineligible for tenure.[8] Finally, cross-plaintiff alleges that in 1967, Stebbins told him that the position opening was for department head because in this way, some permanence could be achieved. This permanence was allegedly necessary in order to upgrade and discipline the Physics Department personnel, and because department chairmen could be removed by vote of the department staff.

Cross-plaintiff does not allege that the defendants publicized the reasons for his demotion. He does argue, however, that the local media publicized statements made by Dr. Lee, as well as by others in the department, asserting that Mandeville was replaced because he was insensitive to the needs of minorities. Defendants allege, however, that cross-plaintiff was demoted solely because of low morale in the department and because cross-plaintiff's administrative skills were lacking.

The parties dispute whether or not cross-plaintiff was ever informed of the reasons for his demotion. Cross-plaintiff, in fact, insists that his administrative skills were above reproach, and that the department's morale was in fact not a problem. In support, cross-plaintiff notes that the administration never received a written complaint concerning cross-plaintiff's leadership except by the Oriental members of the department. Cross-plaintiff further alleges his demotion resulted solely from the fact that the defendants refused to back him, as promised, when he attempted to improve

---

**8.** The MTU Faculty Handbook reads in part:

**D. Persons not Eligible for Tenure**

Part-time faculty members, persons appointed to fill temporary positions or to replace regular faculty members who are absent on leave, and those whose appointments provide for them to continue graduate study on a part-time basis, are not included in those to whom tenure provisions are extended. Such appointments will ordinarily be made on a year-to-year or quarter-to-quarter basis, subject to agreement at the time of employment.

the deficiencies he perceived in his colleagues. Cross-plaintiff now claims that as a result of his demotion and subsequent publication of the reasons for his demotion, his job prospects are severely limited. In support, cross-plaintiff advises that he is a 57-year-old white male, and that because most universities enforce affirmative action programs, he is now unmarketable. He makes no allegation, however, that he has actually sought another administrative position with a different university.

Cross-plaintiff filed his cross-claim on September 16, 1976. Jurisdiction was founded upon 28 U.S.C. § 1343 [9] for claims arising out of 42 U.S.C. §§ 1981, 1983 and 1985(3),[10] and upon 28 U.S.C. § 1331 [11] for claims arising out of violations of the Fourteenth Amendment. More than $10,000 is at stake.

In Count I of cross-plaintiff's cross-claim, he alleges a violation of due process due to his not having received a hearing when demoted. Cross-plaintiff also alleges a violation of his First Amendment rights in that, for example, he was allegedly dismissed because he was honest with his superiors concerning his co-worker's deficiencies, and in that he was prohibited from informing non-Oriental employees in the department that other departments supported cross-plaintiff's leadership.

Count II of the cross-claim alleges reverse discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, arising under 42 U.S.C.

---

9. 28 U.S.C. § 1343 reads:
 §§ 1343. Civil rights and elective franchise
 The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
 (1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;
 (2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;
 (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
 (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

10. 42 U.S.C. § 1985(3) reads:
 (3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

11. 28 U.S.C. § 1331 reads:
 § 1331. Federal question; amount in controversy; costs
 (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.
 (b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff is finally adjudged to be entitled to recover less than the sum or value of $10,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interests and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

§§ 1981 and 1983. Cross-plaintiff also alleges that the individual defendants conspired to deprive cross-plaintiff of his constitutional rights in violation of 42 U.S.C. § 1985(3). Count III is a pendent claim alleging breach of contract. Cross-plaintiff argues that his employment contract with the University implies that the department headship was to be a permanent position and that cross-plaintiff would not be removed without cause or a hearing.

Cross-plaintiff requested temporary [12] and permanent injunctive relief, reinstatement and actual, compensatory and punitive damages amounting to over $2,000,-000.00. Cross-plaintiff has also demanded a jury trial.

■ Defendants have since moved to dismiss cross-plaintiff's cross-claim on the grounds that the court lacks personal and subject matter jurisdiction. Defendants contend that MTU is not a proper party and that the individually-named defendants in their official capacities are not "persons" for purposes of 42 U.S.C. §§ 1983 and 1985(3).[13] Defendants, in their individual capacities, further maintain that cross-plaintiff fails to sufficiently state a claim against them and that the court lacks subject matter jurisdiction over the suit because there has been no violation of cross-plaintiff's Due Process or First Amendment rights. Finally, defendants argue that the court should deny cross-plaintiff's demands for compensatory and punitive damages and for a jury trial. For the reasons that follow, I grant in part and deny in part defendants' motion.

### Deprivation of Property Interests

The defendants initially contend that cross-plaintiff has failed to state a claim in Count I amounting to a violation of the Fourteenth Amendment. Specifically, defendants argue that the cross-claim fails to allege a violation of a liberty or property interest to which due process would apply, and that cross-plaintiff's freedom of speech has not been infringed because statements made to supervisors are not protected by the First Amendment.

The Supreme Court has held, in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), that non-tenured faculty members dismissed from their positions may be entitled to due process protection so long as they can demonstrate an infringement of some property or liberty interest protected by the Fourteenth Amendment.

In *Roth*, an assistant professor who had been hired to teach in a state university for one academic year was advised that he would not be rehired for the coming year. The university rules did not require that any reason be given for the decision not to

---

**12.** A motion for a temporary restraining order was denied by Judge Wendell A. Miles on February 17, 1977.

**13.** Defendants contend that in their official capacity, they are not "persons" under 28 U.S.C. § 1343 and 42 U.S.C. § 1983. The defendants, however, do not question personal jurisdiction over them under 42 U.S.C. § 1981.

28 U.S.C. § 1343 is the jurisdictional provision for claims arising under 42 U.S.C. § 1981, as well as for those arising under Section 1983. Moreover, the arguments pertaining to who is a "person" under Section 1983 would parallel argument concerning "persons" under Section 1981. For these reasons, and because Section 1981 and 1983 are *in pari materia*, I will treat the motion to dismiss as applied to Section 1981, as well as Sections 1983 and 1985(3).

This approach would appear to follow from the Seventh Circuit's decision in *Waters v. Wisconsin Steelworkers of International Har-*

*vester Co.*, 502 F.2d 1309 (1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). There, the court concluded that because Title VII and Section 1981 were parallel remedies, rulings under Title VII exempting exhaustion of contractual remedies should apply in cases involving Section 1981. The court went on to cite cases involving this question as applied in Section 1983 contexts. In a footnote on page 1316, the court added:

"Although these cases treated the exhaustion of remedy requirement with respect to 42 U.S.C. § 1983 of the Civil Rights Act, we think the Court's analysis is applicable to actions brought under 42 U.S.C. § 1981."

In light of this, I am convinced that "persons" under Section 1983 are "persons" under Section 1981. In the same light, parties with immunity under Section 1983 should retain that same immunity under Section 1981.

rehire, and no reason was in fact given for the dismissal. The faculty members at that university had no tenure rights to continued employment, and state law left employment decisions regarding nontenured teachers to the discretion of university officials. After learning of his termination, the teacher filed suit alleging that the university's refusal to advise him of the reasons for his nonretention, coupled with its failure to provide a hearing, violated his right to procedural due process. The Supreme Court rejected this claim, stating:

". . . The only question presented to us at this stage in the case is whether the respondent had a constitutional right to a statement of reasons and a hearing on the University's decision not to rehire him for another year. We hold that he did not.

The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount. But the range of interests protected by procedural due process is not infinite." 408 U.S. 564, 569–570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548.

The Supreme Court first held in *Roth* that it had to examine the nature of the plaintiff's interest at stake to determine if that interest fell within the Fourteenth Amendment's protection of liberty and property. The Court then analyzed the types of "liberty" and "property" interests that were cognizable under the Due Process Clause. It stated as follows regarding liberty interests, at 573–575, 92 S.Ct. at 2707:

"The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the

government is doing to him, notice and an opportunity to be heard are essential.' [citations omitted.] In such a case, due process would accord an opportunity to refute the charge before University officials. In the present case, however, there is no suggestion whatever that the respondent's 'good name, reputation, honor, or integrity' is at stake.

Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would be a different case . . .

\*　\*　\*　\*　\*　\*

Hence, on the record before us, all that clearly appears is that the respondent was not rehired for one year at one university. It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another . . ."

The Supreme Court in *Roth* provided the following analysis of property interests under the Due Process Clause:

"Certain attributes of 'property' interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

\*　\*　\*　\*　\*　\*

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

\*　\*　\*　\*　\*　\*

. . . respondent's 'property' interest in employment at Wisconsin State University-Oshkosh was created and defined by the terms of his appointment. Those terms . . . did not provide for contract renewal absent 'sufficient cause'. Indeed, they made no provision for renewal whatsoever.

Thus, the terms of the respondent's appointment secured absolutely no interest in re-employment for the new year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or created any legitimate claim to it. In these circumstances, the respondent surely had an abstract concern in being re-hired, but he did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment." 408 U.S. 564, 576–578, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548.

The Supreme Court reached a different result in *Perry v. Sindermann, supra,* based upon a different set of facts in that instance. In *Sindermann,* the faculty member had taught in various schools throughout a state college system for ten years. He was employed by the last school for four successive years under a series of one-year contracts. Following a public dispute with the school's Board of Regents, the teacher was notified that he would not receive a new contract for the next academic year. The Regents issued a press release setting forth allegations of insubordination, but no official statement of reasons for non-renewal was given and no hearing was provided.

The plaintiff in *Sindermann* had no tenure and no contractual right to re-employment. Nonetheless, the Supreme Court held that he had stated a sufficient property interest by alleging that the college had a *de facto* tenure program and that he had "tenure" under that program. The Court explained at 599–603 of 408 U.S., at 2698 of 92 S.Ct.:

". . . As in *Roth,* the mere showing that he was not rehired in one particular job, without more, did not amount to a showing of a loss of liberty. Nor did it amount to a showing of a loss of property.

But the respondent's allegations—which we must construe most favorably to the respondent at this stage of the litigation—do raise a genuine issue as to his interest in continued employment at Odessa Junior College. He alleged that this interest, though not secured by a formal contractual tenure provision, was secured by a no less binding understanding fostered by the college administration. In particular, the respondent alleged that the college had a *de facto* tenure program, and that he had tenure under that program. . . ."

\* \* \* \* \* \*

In this case, the respondent has alleged the existence of rules and understandings, promulgated and fostered by state officials, that may justify his legitimate claim of entitlement to continued employment absent 'sufficient cause.' We disagree with the Court of Appeals insofar as it held that a mere subjective 'expectancy' is protected by procedural due process, but we agree that the respondent must be given an opportunity to prove the legitimacy of his claim of such entitlement in light of 'the policies and practices of the institution.' *Sindermann v. Perry,* 5 Cir., 430 F.2d 939, at 943. Proof of such a property interest would not, of course, entitle him to reinstatement. But such proof would obligate college officials to grant a hearing at his request, where he could be informed of the grounds of his nonretention and challenge their sufficiency."

Defendants first assert that cross-plaintiff has not alleged the existence of a property interest protectible by the Fourteenth Amendment. Specifically, defendants argue that headship of the Department of Physics is a non-tenure position and that cross-plaintiff had no legitimate reason to expect permanence in that position. There-

fore, defendants request this court to dismiss plaintiff's cross-claim as it relates to a due process violation based upon a deprivation of cross-plaintiff's property interests.

In assessing defendants' motion, this court must look to see if state law and the existing tenure regulations at MTU create a protectible property interest in employment as head of the Physics Department. *See, Board of Regents v. Roth, supra; Wells v. Murray State University*, 545 F.2d 15 (6th Cir. 1976). While an employee may have a subjective belief that his employment is permanent, no "property interest" exists unless the state creates that interest and objectively fosters the employee's belief. *Coe v. Bogart*, 519 F.2d 10 (6th Cir. 1975).

### A. Authority of University Officers to Promise Tenure.

The authority to grant tenure and make personnel decisions at MTU is vested in the Board of Control, and in no other body. *See*, M.C.L.A. § 390.352, which reads:

Sec. 2. The government of the Michigan technological university, the conduct of its affairs, and the control of its property shall be vested in a board of 8 members, who shall be known as the "board of control of the Michigan technological university", and who shall be appointed by the governor, by and with the advice and consent of the senate. The president of the institution shall be ex officio a member of the board without the right to vote. The members of the board shall serve without compensation, but shall receive their actual and necessary expenses incurred in the performance of the duties of their office.

A majority of the members of the board of control may enact, amend and repeal rules, bylaws and regulations for the conduct of its business and for the government of the institution; fix tuition and other fees and charges; appoint or remove personnel as the interests of the institution and the generally accepted principles of academic tenure permit or require; determine compensation to be paid for services and property; confer degrees and grant diplomas usually conferred or granted by other similar institutions; receive, hold and manage any gift, grant, bequest or devise of funds or property, real or personal, absolutely or in trust, which will promote any of the purposes of its institution; enter into any agreement not inconsistent with this act as may be desirable in the conduct of its affairs; and lease or dispose of any property which comes into its possession, but in so doing it shall not violate any condition or trust to which such property may be subject. All powers customarily exercised by the governing board of a college or university are vested in the board. The enumeration of powers herein is not deemed to exclude any of such powers not expressly excluded by law.

Under Section 352, the Board of Control at MTU clearly is authorized to promulgate regulations for the granting of or denial of tenure at MTU, and to specify the powers and duties of the University's administrative officers. Pursuant to its statutory authority, the Board of Control published a Handbook for Academic Faculty, which lists the duties of the university's President as follows:

"*President*

The Board of Control selects the President, the chief executive officer of the University, who makes policy recommendations to the Board and is responsible for the operation of the institution in accord with approved policy."

The powers and duties of the Vice-President for Academic Affairs are also listed:

"*7. Vice President of Academic Affairs*

Responsible for the guidance and administration of the University's academic program. An Organization Chart indicating the offices and two major committees which report directly to the Vice President of Academic Affairs is found in Appendix J."

■ Notably absent from these regulations is any reference to authority vested in the individual defendants to enter into employment contracts on behalf of the univer-

sity. Therefore, it would appear that neither President Smith, nor Mr. Stebbins, had any authority to bind the university to any promise of tenure. Under state law, such a compact could be made by the Board of Control, and by no other party.

The Michigan Supreme Court precisely so held in *Sittler v. Board of Control, Michigan College of Mining and Technology*, 333 Mich. 681, 53 N.W.2d 681 (1952). There, a plaintiff German professor was hired by the college [14] based upon a letter written to the plaintiff by the department chairman confirming plaintiff's employment. The court declared the employment contract to be null and void. In reaching this conclusion, the court ruled that the Board of Control, acting pursuant to a state statute virtually identical to M.C.L.A. § 390.352, could not delegate to any other party its authority to contract with teachers. Moreover, the court stated, 53 N.W.2d at 683–684, that even if department chairmen customarily had entered into employment contracts with assistant professors in the past, such acts could not bind the Board of Control:

> Plaintiff asserts that the power to contract with teachers may be delegated, and in the instant case that it is at least a question of fact if such power were not delegated by the board of control to Professor Bennett. In asserting the board's right to delegate the power, which by statute is vested in the board, appellant cites *People v. Fournier*, 175 Mich. 364, 141 N.W. 689. However we think the cited case is not in point. It involved only the right of delegating the power of passing upon the right to be licensed as a stationary engineer in the city of Saginaw, which was considered necessary to proper administration of the police power. But the instant case involved the right by contract to bind the State in the operation of one of its educational institutions over a period of time and to expend public funds in greater or less amounts. Powers of the character vested by the above statutory provisions in a board of control of an educational institution

maintained by the State cannot be delegated to some subordinate or representative.

> "The board of supervisors cannot delegate such powers as the law requires to be submitted to their corporate discretion and judgment." *People ex rel. Chadwick v. County Officers of St. Clair (syllabus)*, 15 Mich. 85.

> "The statutory authority conferred upon boards of supervisors to regulate the bridging of navigable streams is a trust that must be executed by themselves; they cannot delegate it to others * * *." *Maxwell v. Bay City Bridge Co. (syllabus)*, 41 Mich. 453, 2 N.W. 639.

> It follows that plaintiff did not possess a contract under which he could assert rights. Even the letter written by Professor Bennett does not purport on its face to be a contract. We are mindful that it appears in plaintiff's opposition to the motion to dismiss that on other occasions heads of departments have hired assistant teachers; but such usage or custom, if it ever prevailed, cannot be availed of to enlarge the statutory powers of the board of control so as to include or justify acts which are unauthorized and contrary to the applicable statutory law.

The court therefore concluded, 53 N.W.2d at 684:

> Plaintiff did not have a contract with the board of control of the Michigan college of mining and technology, nor were the negotiations between plaintiff and Professor Bennett such as to constitute a contract binding upon the defendants in the instant case. Because of an absolute lack of power vested in Professor Bennett to consummate a contract with plaintiff which would be binding upon defendants, nothing appearing in this record would or could constitute ratification of an alleged contract as asserted by appellant.

■ I am persuaded, in light of *Sittler*, that cross-plaintiff cannot base a charge that he has been deprived of a property

---

**14.** MTU was previously named the Michigan College of Mining and Technology.

interest solely on the fact, if indeed it is true, that defendants told cross-plaintiff that his position as department head would be permanent. Neither Smith nor Stebbins had any authority to bind the university to terms of a contract not adopted by the Board of Control. Cross-plaintiff's property interests must arise out of the regulations or activities of the ruling board, and no other source.

The Handbook for Academic Faculty makes clear that administrative posts are not tenured. According to the Handbook, only assistant professors, associate professors and professors are entitled to obtain tenure. Notably, the office of Department Head is omitted.

■ Moreover, in reference to administrative officers, the Handbook reads:

"*C. Administrative Officers*

1. Appointments to administrative posts do not carry tenure. Administrative officers continue in their posts as determined by the President and the Board of Control.

2. Administrative officers holding an academic rank are subject to the provisions applicable to such rank, only insofar as their nonadministrative faculty status is concerned."

I read this excerpt to include department heads. In light of this, and the fact that no department head at MTU has ever obtained tenure in that position, I conclude that cross-plaintiff cannot base a property interest claim in his position as head of the Department of Physics upon the alleged promises of the defendants.

### B. The Employment Contract.

Although cross-plaintiff cannot rely upon statements made by President Smith or Vice-President Stebbins concerning cross-plaintiff's tenure as head of the Physics Department, cross-plaintiff also argues that implicit in his employment contract with the University is an understanding that he would not be dismissed absent "cause" or a hearing. This understanding, cross-plaintiff insists arises out of the fact that the University knew cross-plaintiff rejected other, significant job offers in order to accept a position at MTU, and that cross-plaintiff expended a large amount of money to move his family from Kansas to Michigan. Cross-plaintiff consequently argues that as head of the Department of Physics, he was other than an employee-at-will, and that defendants could not demote him, absent a hearing, without depriving him of his property interests.

To the contrary, defendants contend that because cross-plaintiff's employment contract is for an indefinite term, cross-plaintiff is merely an employee-at-will. As such, cross-plaintiff is said to have no property interest in his headship beyond that expressly provided in his contract, and as a result could be demoted at any time without violating the Due Process Clause of the Fourteenth Amendment.

■ In Michigan, contracts for permanent or life employment are considered indefinite hirings which, absent distinguishing features or consideration in addition to the services rendered, are terminable at the will of either party. *See, Lynas v. Maxwell Farms,* 279 Mich. 684, 273 N.W. 315 (1937); *Milligan v. Union Corp.,* 87 Mich.App. 179, 274 N.W.2d 10 (1978). Cross-plaintiff alleges that this is a case where distinguishing features or additional consideration exist, thus militating against the argument that the contract in question was one at will. Cross-plaintiff argues that defendant knew cross-plaintiff would have to move from Kansas to Michigan, and that he would have to forego other employment opportunities.

In support, cross-plaintiff cites *Hackett v. Food Maker Inc.,* 69 Mich.App. 591, 245 N.W.2d 140 (1976), *lv. den.,* 399 Mich. 823 (1977), where the Court of Appeals held that an employee could maintain a breach of contract action against his employer arising out of an indefinite employment contract, in part because the employee had obtained an early release from the Navy and had travelled to Michigan in order to perform. I find *Hackett* to be distinguishable. In that case, the defendant employer

repudiated the contract even before plaintiff came to work. This fact obviously impressed the Court of Appeals panel, because it said, 245 N.W.2d at 141–142:

> In both *Lynas* and *Adolph* there was evidence indicating that services under the contract for personal employment were commenced by plaintiff. Here plaintiff was never afforded an opportunity to perform under the contract due to defendant's total repudiation thereof in that defendant never allowed plaintiff an opportunity to manage the Ypsilanti store.

Unable to locate any Michigan case law on point we look to 4 Corbin on Contracts, § 958, p. 847, wherein we find the following:

> "A contract of employment to begin at a future time is totally broken by the employer's refusal to begin such employment at that time. On such refusal, the employee has a single action for his injury, measured by the full amount of salary or wages promised, less what he can earn by reasonable effort in other similar employment."

Hence, we hold that, if a contract was proven by plaintiff that he was to become manager of the Ypsilanti store and was prevented from so doing due to defendant's repudiation thereof prior to the time any services were commenced, plaintiff has a right to recover.

■ Contrary to cross-plaintiff's position, the general rule is that relinquishment of prior employment itself is insufficient additional detriment to turn a contract at will into some other type of contract. *See, Anno: Relinquishment of Other Job, Business, or Profession in Order to Accept Permanent or Lifetime Employment Contract,* 60 A.L.R.3d 264. In harsh situations involving arbitrary dismissal, exceptions are often found. *See, Rowe v. Noren Pattern & Foundry Co.,* 91 Mich.App. 254, 283 N.W.2d 713 (1979). In most cases, however, employees have irretrievably lost valuable benefits without receiving substantial benefits in return.

For example, in *Rowe*, the employee had worked 13½ years for another employer and had only 1½ years remaining before his pension with that employer vested. After changing employers, plaintiff was summarily fired on the 43rd day of work, whereas he would have been eligible for union protection after 45 days of work. Moreover, plaintiff testified he was informed by the defendant employer "that the only way I would get laid off is if the company closed down". The state Court of Appeals concluded that plaintiff irretrievably lost a substantial benefit, and for that reason, the court upheld maintenance of plaintiff's suit, even though plaintiff's employment contract was "at will".

■ In the present case, cross-plaintiff left a tenured position in order to obtain another tenured position at a second university. He received tenure less than one year later, although apparently not in both his capacity as a professor of physics and his capacity as head of the department. Cross-plaintiff thereafter retained his position as (non-tenured) department head for over six years, when he was finally replaced without a hearing. I cannot believe that this is a case where sufficient bargained-for consideration or arbitrary harm to the employee requires this court to read cross-plaintiff's indefinite employment contract as an exception to the general rule. By giving up his former job, and by turning down other employment opportunities (none of which offered cross-plaintiff better terms than he received at MTU) cross-plaintiff did nothing more than was necessary to begin his employment. *See, Lynas v. Maxwell Farms, supra.* I hold, therefore, that cross-plaintiff's employment contract was solely a contract at will which was terminable by either party at any time.

■ Because cross-plaintiff was merely an employee-at-will in his position as head of the Department of Physics, no property interest in his continued employment in that capacity exists under state law. For this reason, and those set out above concerning cross-plaintiff's expectations of tenure, I hold that cross-plaintiff has failed to

state a claim under the Due Process Clause involving an alleged deprivation of property. I accordingly dismiss that aspect of cross-plaintiff's cross-claim.

### Deprivation of Liberty Interests

Defendants next maintain that cross-plaintiff has failed to allege a deprivation of his liberty interest cognizable under the Fourteenth Amendment. Specifically, defendants contend that cross-plaintiff's dismissal was based upon grounds of poor performance and general incompetence. These grounds, defendants argue, are insufficient grounds for creating a due process claim. *See, Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1975), where the Court upheld a police officer's dismissal as not violative of the Due Process Clause because the employee's dismissal was based on his failure to follow orders, poor attendance at police training classes, and conduct unsuited of an officer, and because these charges were not made public.

Defendants further argue that even if cross-plaintiff's allegations do involve grounds more stigmatic than those involved in *Bishop v. Wood, supra,* a claim against the defendants is unwarranted because defendants never publicized the reasons for cross-plaintiff's dismissal. Because I find that cross-plaintiff's dismissal allegedly was based upon grounds which potentially infringe upon cross-plaintiff's liberty interests, and because I hold that defendants need not have been the parties responsible for publication of the reasons for cross-plaintiff's dismissal, I deny defendant's motion to dismiss.

### A. Effect on Cross-Plaintiff's Reputation.

█ Not every summary dismissal from employment amounts to a violation of due process. The Sixth Circuit spoke to this issue in *Lake Michigan College Federation of Teachers v. Lake Michigan Community College,* 518 F.2d 1091 (1975), *cert. denied* 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1197 (1976), where it said, at 1096–1097:

> Thus it appears that due process safeguards would apply if the discharge of a

teacher foreclosed future employment opportunities that otherwise would be open to him or if the grounds for the discharge tend to discredit the teacher's honesty or integrity or to damage his standing in the community. The federal courts have had many opportunities to refine and to apply the general guidelines set forth in *Roth.* For example, liberty interests are not implicated when a teacher is charged with failure to meet minimum standards in his professional relationship with students. *Blair v. Board of Regents,* 496 F.2d 322 (6th Cir. 1974). Similarly, allegations of improper or inadequate performance do not constitute a deprivation of liberty within the meaning of the fourteenth amendment. *Abeyta v. Town of Taos,* 499 F.2d 323 (10th Cir. 1974); *Shirck v. Thomas,* 486 F.2d 691 (7th Cir. 1973). It has been held that in certain circumstances even the charge of "incompetence, neglect of duty and malfeasance in office" does not amount to a deprivation of liberty under *Roth.* *Adams v. Walker,* 492 F.2d 1003, 1008–09 (7th Cir. 1974).

On the other hand, it is also true that a violation of plaintiff's liberty interest exists where the employer stigmatizes the employee as being mentally ill, untruthful or fraudulent. *See, Lombard v. Board of Education,* 502 F.2d 636, 637–638 (2nd Cir. 1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975); *Huntley v. Board of Education,* 493 F.2d 1016, 1019 (4th Cir. 1974); *Hostrop v. Board of Junior College District No. 515,* 471 F.2d 488, 494 (7th Cir. 1972), *cert. denied* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973). For example, in *Osmer v. Moiles,* 409 F.Supp. 675 (E.D.Mich.1975), the district court held that plaintiff had raised a claim cognizable under the Fourteenth Amendment where his dismissal from the sheriff's department was due to plaintiff's having used his position as a police officer to collect a private debt. The court noted, at 676–677, that "(t)he charge against plaintiff is not general in nature but is specific and contains a great potential for stigmatization."

■ The same is true in this case. The charges that cross-plaintiff was racist or insensitive to minorities are charges which are both serious and specific in nature. No stretch of the imagination is required to infer that cross-plaintiff's reputation and reemployment prospects resultingly are gravely diminished. I conclude, therefore, that cross-plaintiff's cross-claim sufficiently alleges a potential deprivation of a liberty interest cognizable under the Due Process Clause.

## B. Publication of Charges.

Defendants further contend that cross-plaintiff has failed to state a claim because cross-plaintiff has not shown that defendants publicized their reasons for demoting him. While it is true that the decisions in *Roth, Bishop* and *Sindermann,* make clear that plaintiff has an actionable claim if he can show that his dismissal infringes a liberty interest enforceable under the Constitution, these cases do not specify whether due process attaches when the defendant himself has not publicized the reasons for plaintiff's dismissal.

Defendants argue that the Supreme Court decision in *Bishop v. Wood, supra,* makes clear that plaintiff can claim no deprivation of a liberty interest by the defendants where the defendants have not publicized their reasons for demoting him. I do not agree. In *Bishop,* the plaintiff police officer was summarily dismissed on grounds of incompetence. The Court ruled that plaintiff did not suffer a deprivation of his liberty interests, even though the charges against him may have been stigmatic, because those charges were never publicized. In rejecting plaintiff's claim, the Court stated at 348–349 of 426 U.S., at 2079 of 96 S.Ct.:

> In *Board of Regents v. Roth,* 408 U.S. 564, [92 S.Ct. 2701, 33 L.Ed.2d 548,] we recognized that the nonretention of an untenured college teacher might make him somewhat less attractive to other employers, but nevertheless concluded that it would stretch the concept too far "to suggest that a person is deprived of

'liberty' when he simply is not rehired in one job but remains as free as before to seek another." *Id.,* at 575 [, 92 S.Ct. 2701.] This same conclusion applies to the discharge of a public employee whose position is terminable at the will of the employer when there is no public disclosure of the reasons for the discharge.

In this case the asserted reasons for the City Manager's decision were communicated orally to the petitioner in private and also were stated in writing in answer to interrogatories after this litigation commenced. Since the former communication was not made public, it cannot properly form the basis for a claim that petitioner's interest in his "good name, reputation, honor, or integrity" [12] was thereby impaired. And since the latter communication was made in the course of a judicial proceeding which did not commence until after petitioner had suffered the injury for which he seeks redress, it surely cannot provide retroactive support for his claim. A contrary evaluation of either explanation would penalize forthright and truthful communication between employer and employee in the former instance, and between litigants in the latter.

Petitioner argues, however, that the reasons given for his discharge were false. Even so, the reasons stated to him in private had no different impact on his reputation than if they had been true.

In the present case, however, the charges against cross-plaintiff *were* publicized, though publication may not have been by the defendants. *Bishop* is distinguishable, because in that case, whatever notoriety existed arose from the plaintiff himself amidst judicial proceedings.

To the contrary, in *Osmer v. Moiles, supra,* the district judge denied a motion for summary judgment by the former employer of a discharged probationary sheriff. The sheriff was fired because he allegedly used his position as a law enforcement officer to collect a private debt. Thereafter, the sheriff brought suit under Section 1983 because he was afforded no due process hearing.

The district court ruled that there may have been a violation of plaintiff's liberty interests because plaintiff was given no opportunity to rebut the serious and stigmatizing charges against him. This was true even though the disputed charges were communicated privately to plaintiff and were never publicized by the employer.

Furthermore, in *Roth*, the Supreme Court stated at 573 of 408 U.S., at 2707 of 92 S.Ct.:

> The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. For "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential."

These cases convince me that an employee's liberty interests are infringed where the employer knows, or reasonably should have known, that in dismissing the employee, the employee's good name, honor or integrity will be diminished. While the employer himself may not be publicizing what are generally known to be the reasons for the employee's dismissal, the employer is injuring the employee by, in effect, supporting the community's belief that the employee lacks integrity. An employer injures his employee when he knowingly fails to provide an employee an opportunity to rebut what the employer should know are the publicly-believed reasons for the employee's dismissal. A due process hearing, in that context, minimally provides the employee an opportunity to establish that, even if he is to be dismissed, his dismissal follows from legitimate reasons and not the stigmatic ones generally supposed.[15]

For this reason, assuming that cross-plaintiff can show that the public gen- erally and reasonably understood cross-plaintiff's dismissal to be for the reasons alleged, and assuming that cross-plaintiff can show that the defendants knew or should have known of the potential harm to cross-plaintiff's reputation, I find that cross-plaintiff will have demonstrated a deprivation of his liberty interests cognizable under the Due Process Clause. Consequently, I deny at this time defendants' motion to dismiss.

### First Amendment Claim

Cross-plaintiff lastly alleges in Count I a violation of his First Amendment rights to freedom of speech. Specifically, cross-plaintiff asserts that (1) his dismissal arose out of his frankness with his superiors concerning perceived deficiencies in cross-plaintiff's colleagues; (2) cross-plaintiff was prohibited from making known to others in the department his evaluation of subordinates' abilities; and (3) cross-plaintiff was prohibited from informing subordinates that other departments in the university supported his leadership.

The United States Supreme Court, in several recent cases, has repeatedly affirmed the fact that public employees do not lose their First Amendment rights by merely obtaining public employment. *See, Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

In *Pickering*, the Court held that a public teacher cannot constitutionally be required to relinquish his freedom "to comment on matters of public interest in connection with the operation of the public school . . ." 391 U.S. at 568, 88 S.Ct. at 1734. Instead, the Court determined, public employees are free to criticize their employers so long as their statements do

---

**15.** This does not mean that plaintiff's employment cannot be discontinued. Public employers are merely obligated to afford their employ- ees, in the limited set of circumstances discussed herein, an opportunity to defend their reputations.

not impede the regular operation of the business. *See, McGill v. Board of Education*, 602 F.2d 774 (7th Cir. 1979). Hence, under *Pickering*, a public employee may not be dismissed for making public statements which involve matters of the public interest and which are not disruptive of their employer's activities. *Id.*, at 777. Moreover, the employee's First Amendment rights attach even though the statements were privately, rather than publicly, expressed. *Givhan v. School District, supra.*

■ The question of whether a public employee's speech is constitutionally protected necessarily entails striking "a balance between the interests of the (employee), as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering, supra*, 391 U.S. at 568, 88 S.Ct. at 1734. *See also, Mt. Healthy School Board v. Doyle, supra.* It follows from this that in addressing cross-plaintiff's claim of First Amendment protection, this court must assess what effect cross-plaintiff's speech might have had on the effective operation of the university. If cross-plaintiff's speech does not concern matters of public interest, or if its effect, on balance, unreasonably disrupts the university's activities, then cross-plaintiff has no claim of First Amendment protection which presently can be relied upon. I conclude that the second and third aspects of cross-plaintiff's cross-claim do not involve matters protected by the First Amendment, i. e., his desire to inform his subordinates of department members' deficiencies and his alleged support by other departments in the university.

■ Cross-plaintiff can claim no First Amendment rights to inform certain department members of the deficiencies he perceives in other department members. This is not a matter of public concern, but relates solely to the effective operation of the university. More importantly, publication of cross-plaintiff's statements would undermine and impair the administration's authority when the school administration refused to support cross-plaintiff, and would pit the Department Head against the school president. Such a tension would have a deleterious effect upon department discipline.

■ The same is true of cross-plaintiff's demand to inform his subordinates that other departments supported cross-plaintiff's leadership. No one can doubt that the school administration has a legitimate interest in restraining cross-plaintiff's desire to stir dissention in his department. The effect of cross-plaintiff's statements, if made, would be to divide the department into two camps, those supporting cross-plaintiff and those opposing him. The result would devastate what both parties agree was an already unmotivated group of professionals. I conclude that the university's interest in maintaining department discipline far outweighs cross-plaintiff's interest in eliciting support of his headship.

■ In spite of this, I am convinced that cross-plaintiff has nevertheless asserted a claim which is cognizable under the First Amendment. I read cross-plaintiff's allegations as suggesting that he was dismissed for informing his superiors that he disagreed with their purported practice of promoting employees on the basis of race. This is a matter of public concern no different from that involved in *Givhan*. There, a teacher's hostile, loud and even insulting statements to the school principal were declared to be constitutionally protected because they involved allegations of racially discriminatory practices at school. In the same way, cross-plaintiff's disagreements with university officials arose out of a dispute over the alleged practice of promoting unqualified persons solely because they are members of racial minorities. I consequently conclude that cross-plaintiff's statements involve matters of public concern.

Moreover, defendants have not shown that cross-plaintiff's statements, privately expressed, interfered with the effective operation of the university. While it may be true that cross-plaintiff's comments under-

mine the parties' working relationship,[16] the evidence at this stage of the litigation fails to establish that on balance cross-plaintiff's First Amendment interests do not outweigh the university's interest in its effective operations.

Having sufficiently established that a First Amendment claim may exist, cross-plaintiff must also hurdle two other barriers. First, cross-plaintiff's claims will fail where defendants can establish that cross-plaintiff's protected conduct was not a factor in his dismissal. *See, Mt. Healthy School District v. Doyle, supra,* 429 U.S. at 285–286, 97 S.Ct. at 575–576. Second, cross-plaintiff's claim will also fail if defendants can show that cross-plaintiff would have been fired even absent the protected conduct. *Doyle, supra,* at 287, 97 S.Ct. at 576.

Defendants have argued that President Smith's affidavit establishes the fact that cross-plaintiff was fired because he was a poor administrator and not because of statements made in private whereby cross-plaintiff disagreed with university policies. Defendants contend, therefore, that cross-plaintiff's protected conduct was not a factor in his dismissal, and even if it was, cross-plaintiff would have been demoted in any event.

To the contrary, cross-plaintiff steadfastly denies the allegation that he was a poor administrator or that the low department morale could be attributed to him. Instead, cross-plaintiff maintains that his dismissal arose out of impermissible reverse discrimination and retaliation for refusal to abide by (allegedly discriminatory) university policy. Cross-plaintiff's responses raise ques-

tions of fact which cannot be determined by this court at this time. Consequently, I deny defendants' motion to dismiss the First Amendment contentions of Count I of the cross-claim as they relate to cross-plaintiff's private disagreement with university policy made to his supervisors.[17]

### Breach of Contract

In Count III of the cross-claim, cross-plaintiff alleges breach of employment contract. Defendants move to dismiss this count on grounds that the employment contract between cross-plaintiff and MTU was a contract at will and, therefore, terminable by either party at any time. For the reasons set out earlier in this opinion concerning an alleged deprivation of cross-plaintiff's property interests, I dismiss Count III of the cross-claim for failure to state a claim.

### Michigan Technological University as Proper Party

Defendants next raise questions concerning whether they are proper parties to the action. Specifically, defendants maintain (1) MTU, as a state agency, is not a "person" under Section 1983 and Section 1985; (2) a monetary damage remedy cannot be applied against the individual defendants, in their official capacities, because of the doctrine of sovereign immunity; and (3) cross-plaintiff has failed to properly allege a "conspiracy" under Section 1985(3).

*A. Existence of Eleventh Amendment Immunity.*

Defendants first contend that MTU cannot be named as a defendant to the cross-

---

16. In this respect, see Justice Rehnquist's comments in *Givhan,* 439 U.S. at pages 414–415, *especially note 4,* 99 S.Ct. at page 696, especially note 4, which reads:

 4 Although the First Amendment's protection of government employees extends to private as well as public expression, striking the *Pickering* balance in each context may involve different considerations. When a teacher speaks publicly, it is generally the *content* of his statements that must be assessed to determine whether they "in any way either impeded the teacher's proper performance of his daily duties in the classroom or . . . interfered with the regular oper-

ation of the schools generally." *Id.,* 391 U.S. at 572–573 [, 88 S.Ct., at 1737.] Private expression, however, may in some situations bring additional factors to the *Pickering* calculus. When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered.

17. Defendants do not challenge cross-plaintiff's claim of reverse discrimination found in Count II.

claim both because it is not a "person" for purposes of Section 1983 and because as a state university it is an arm of the state and therefore able to invoke the doctrine of sovereign immunity.

Although it has debated the issue in dicta, the Supreme Court has never decided whether a state is a "person" for purposes of Section 1983. *Cf., e. g., Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (Stevens dissenting); *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) (Brennan concurring) (Powell concurring and dissenting).[18] The question has become insignificant, however, because of recent Supreme Court decisions holding that under the Eleventh Amendment,[19] federal courts lack jurisdiction over states or their agents. *See, Alabama v. Pugh, supra; Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

■ The Eleventh Amendment bars any action in law or in equity against one of the States by the citizens of another State, or citizens of another country.[20] *Missouri v. Fiske,* 290 U.S. 18, 54 S.Ct. 18, 78 L.Ed. 145 (1933). Although the amendment does not bar a suit for prospective, equitable relief against state officers, *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Court has frequently said that suits for retrospective, monetary relief are barred. *See, e. g., Quern v. Jordan, supra.* The Court extended this reasoning, in *Alabama v. Pugh, supra,* to include cases against states involving only injunctive relief. There, the district court had determined that Alabama's prison conditions amounted to cruel and unusual punishment, and issued an order prescribing measures designed to remedy the plaintiff's plight. On appeal, the Court, per curiam, dismissed as defendant the State of Alabama and the Alabama Board of Corrections because of Eleventh Amendment sovereign immunity. In reaching its conclusion, the Court stated at 3057–3058 of 98 S.Ct.:

Among the claims raised here by petitioners is that the issuance of a mandatory injunction against the State of Alabama and the Alabama Board of Corrections is unconstitutional because the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies. The Court of Appeals did not address this contention, perhaps because it was of the view that in light of the numerous individual defendants in the case dismissal as to these two defendants would not affect the scope of the injunction. There can be no doubt, however, that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing

**18.** The Sixth Circuit has in fact determined that a state is not a "person" under Section 1983, *Deane Hill Country Club, Inc. v. City of Knoxville,* 379 F.2d 321 (6th Cir.), *cert. denied* 389 U.S. 975, 88 S.Ct. 476, 19 L.Ed.2d 467 (1967), a rule which was later impliedly questioned in *Ohio Inns, Inc. v. Nye,* 542 F.2d 673 (6th Cir. 1976), *cert. denied,* 430 U.S. 946, 97 S.Ct. 1583, 51 L.Ed.2d 794 (1977). The decision in *Deane Hill* was based upon the Supreme Court's holding in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), that municipalities, as bodies which administer state law, were not "persons" for purposes of Section 1983.

However, in *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court reinterpreted the legislative history of Section 1983 and overruled *Monroe.* The Court in *Monell* expressly concluded that Congress intended Section 1983 to reach all "persons" responsible for violations of citizens' civil

rights. This includes "bodies politic". 436 U.S. at 690, 98 S.Ct. at 2035. Therefore, it is an open question whether or not in light of the ruling in *Monell,* states are "persons".

**19.** Amendment Eleven to the Constitution of the United States reads:

**AMENDMENT XI—SUITS AGAINST STATES**

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

**20.** Although by its terms the Amendment only applies to actions against a state by citizens of another state, the immunity it confers extends as well to actions by the defendant state's own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

of such a suit. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); *Worcester County Trust Co. v. Riley,* 302 U.S. 292, 58 S.Ct. 185, 82 L.Ed. 268 (1937). Respondents do not contend that Alabama has consented to this suit, and it appears that no consent could be given under Art. I, § 14 of the Alabama Constitution which provides that "the State of Alabama shall never be made a defendant in any court of law or equity." Moreover, the question of the State's Eleventh Amendment immunity is not merely academic. Alabama has an interest in being dismissed from this action in order to eliminate the danger of being held in contempt if it should fail to comply with the mandatory injunction. (Footnote omitted.)

The holding in *Pugh* was discussed with approval by the Court in *Quern v. Jordan, supra.* Justice Rehnquist there noted that as the Court has previously held, the Fourteenth Amendment abrogated in part States' immunity under the Eleventh Amendment. For this reason, legislation enacted pursuant to Section 5 of the Fourteenth Amendment could be applied against states and their agents even though those states did not waive their immunity under the Eleventh Amendment. *See, Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). However, Justice Rehnquist argued, the Fourteenth Amendment did not repeal the Eleventh Amendment, but merely authorized Congress to pass legislation designed to enforce due process and equal protection. For this reason, the Court held that not every statute enacted pursuant to Section 5 of the Fourteenth Amendment would be applied against the States themselves. Instead, only those statutes which expressly abrogated the Eleventh Amendment's grant of sovereign immunity would empower federal court jurisdiction. Because no express statement existed in the legislative history of the 1871 Civil Rights Act indicating Congress' intent to revoke States' immunity, the Court said, suits against states under Section 1983 were barred absent a state's waiver of its immunity. In reaching this conclusion, the Court stated at 342–343 of 440 U.S., at 1146 of 99 S.Ct.:

There is no question that both the supporters and opponents of the Civil Rights Act of 1871 believed that the Act ceded to the Federal Government many important powers that previously had been considered to be within the exclusive province of the individual States. Many of the remarks from the legislative history of the Act quoted in Mr. Justice Brennan's opinion amply demonstrate this point. *Post,* at 359–365 [99 S.Ct. 1155–1158]. See also *Monroe v. Pape,* 365 U.S. 167, 173–176 [81 S.Ct. 473, 5 L.Ed.2d 492] (1961). But neither logic, the circumstances surrounding the adoption of the Fourteenth Amendment, nor the legislative history of the 1871 Act compel, or even warrant, a leap from this proposition to the conclusion that Congress intended by the general language of the Act to overturn the constitutionally guaranteed immunity of the several States. In *Tenney v. Brandhove,* 341 U.S. 367 [71 S.Ct. 783, 95 L.Ed. 1019] (1951), the Court rejected a similar attempt to interpret the word "person" in § 1983 as a withdrawal of the historic immunity of state legislators. The Court's words bear repeating here:

"Did Congress by the general language of its 1871 statute mean to overturn the tradition of legislative freedom achieved in England by Civil War and carefully preserved in the formation of State and National Governments here? Did it mean to subject legislators to civil liability for acts done within the sphere of legislative activity? . . . The limits of §§ 1 and 2 of the 1871 statute—now §§ 43 and 47(3) of Title 8—were not spelled out in debate. We cannot believe that Congress—itself a staunch advocate of legislative freedom—would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language before us." 341 U.S., at 376 [71 S.Ct. 783].

Given the importance of the States' traditional sovereign immunity, if in fact the Members of the 42d Congress believed that § 1 of the 1871 Act overrode that immunity, surely there would have been lengthy debate on this point and it would have been paraded out by the opponents of the Act along with the other evils that they thought would result from the Act. Instead, § 1 passed with only limited debate and not one Member of Congress mentioned the Eleventh Amendment or the direct financial consequences to the States of enacting § 1. We can only conclude that this silence on the matter is itself a significant indication of the legislative intent of § 1. (Footnotes omitted.)

 These recent pronouncements by the Court [21] convince me that states are immune from suits under Section 1983.[22] Similarly, because it is *in pari materia*, I believe the same ruling would hold true for Section 1985. *Cf., Bosely v. City of Euclid*, 496 F.2d 193 (6th Cir. 1974). Moreover, it has long been held that Eleventh Amendment immunity equally applies to agents of states, as well as to states themselves. *See, e. g., Alabama v. Pugh, supra; Soni v. Board of Trustees of University of Tennessee*, 513 F.2d 347 (6th Cir. 1975), *cert. denied* 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976). Consequently, if MTU is an agent of the state and has not waived the immunity granted to it by the Eleventh Amendment, it must be dismissed from the present action.

### B. Waiver of Immunity by MTU.

In *Soni, supra*, a unanimous Sixth Circuit panel held that suits based upon a due process deprivation could be maintained against the University of Tennessee because it had waived its immunity from suit. In reaching that conclusion, the court set forth a two-prong test for determining the existence of immunity which compelled reference to the particular circumstances of each university or agency in question. *See also, Long v. Richardson*, 525 F.2d 74 (6th Cir. 1975). Because, the panel concluded, a waiver of constitutional immunity cannot be lightly inferred, a court must look for clear and explicit language of waiver. 513 F.2d at 352. Moreover, a court should look at state court interpretations of the issue which, while not binding, are highly persuasive.

The panel in *Soni* held that the University of Tennessee had waived its Eleventh Amendment immunity. The University's charter provided that "(t)he said trustees and their successors . . . may sue and be sued, plead and be impleaded, in any court of law or equity in this State or elsewhere." Although the appellate court

**21.** I have serious reservations concerning the majority's treatment of Section 1983 in *Quern. Monell*, I believe, convincingly establishes that Congress intended Section 1983 to have the fullest possible reach against violators of citizens' civil rights. Statements by Representative Billingham, the author of Section 1983, make clear, I believe, that Section 1983 was intended to be applied against the States. I respectfully suggest the Court overlooks this authority because Congress never *expressly* abrogated Eleventh Amendment immunity. This "clear statement" rule, announced by Justice Powell in his concurring and dissenting opinion in *Hutto*, did not exist in 1871. I believe it to be unwise to apply such a strict rule of interpretation to a civil rights statute where Congress had no knowledge of the existence of such a rule interpretation at the time the statute in question was enacted. *Cf., Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979).

Nevertheless, these pronouncements of the Court are binding regardless of my reservations.

**22.** Cases decided after *Pugh* was handed down unanimously have held that states retain Eleventh Amendment immunity under Section 1983. *See, Student Coalition for Gay Rights v. Austin Peay State University*, 477 F.Supp. 1267 (M.D.Tenn.1979); *Haddon Township Board of Education v. New Jersey Department of Education*, 476 F.Supp. 681 (D.C.N.J.1979); *Savage v. Commonwealth of Pennsylvania*, 475 F.Supp. 524 (S.D.Pa.1979); *Wiesenfeld v. State of New York*, 474 F.Supp. 1141 (S.D.N.Y.1979); *Hart v. University of Texas at Houston*, 474 F.Supp. 465 (S.D.Tex.1979); *Allied Artists Pictures Corp. v. Rhodes*, 473 F.Supp. 560 (S.D.Ohio 1979); *Jordan v. Hawaii Government Employees Assoc.*, 472 F.Supp. 1123 (D.C.Haw.1979); *Palila v. Hawaii Department of Land & Natural Resources*, 471 F.Supp. 985 (D.C.Haw.1979).

recognized that a state's consent to be sued in its own courts did not necessarily imply consent to be sued in the federal court, it nevertheless held that the consent to be sued granted by the University of Tennessee was especially broad and not intended to be limited to state courts.

In fact, however, *Soni* exists as a unique holding. Other cases in this circuit involving the same issue of Eleventh Amendment immunity for state universities consistently have ruled that federal courts lack jurisdiction. *See*, e. g., *Martin v. University of Louisville*, 541 F.2d 1171 (6th Cir. 1976); *Long v. Richardson, supra*. In fact, this circuit has been very restrictive in finding waiver, even where clauses existed similar to that involved in *Soni*.

23. Article 8, Section 6 of the Michigan Constitution of 1963 reads:

Sec. 6. Other institutions of higher education established by law having authority to grant baccalaureate *degrees* shall each be governed by a board of control which shall be a body corporate. The board shall have general supervision of the institution and the control and direction of all expenditures from the institution's funds. It shall, as often as necessary, elect a president of the institution under its supervision. He shall be the principal executive officer of the institution and be ex-officio a member of the board without the right to vote. The board may elect one of its members or may designate the president, to preside at board meetings. Each board of control shall consist of eight members who shall hold office for terms of eight years, not more than two of which shall expire in the same year, and who shall be appointed by the governor by and with the advice and consent of the senate. Vacancies shall be filled in like manner.

24. Article 8, Section 4 of the Michigan Constitution of 1963 reads:

Sec. 4. The legislature shall appropriate moneys to maintain the University of Michigan, Michigan State University, Wayne State University, Eastern Michigan University, Michigan College of Science and Technology, Central Michigan University, Northern Michigan University, Western Michigan University, Ferris Institute, Grand Valley State College, by whatever names such institutions may hereafter be known, and other institutions of higher education established by law. The legislature shall be given an annual accounting of all income and expenditures by each of these educational institutions. Formal sessions of governing boards of such institutions shall be open to the public.

Turning then to defendant MTU, I find no waiver of Eleventh Amendment immunity. The university was founded in 1885 by an action of the Michigan Legislature, and was operated under statutory authority until 1963. In 1964, under the new State Constitution, Article 8, Section 6, MTU became a constitutional corporate body.[23] Under Article 8, Section 4, of the Michigan Constitution, the legislature is required to appropriate money to maintain the school.[24] Moreover, members of the Board of Control, whose duties and powers are established under M.C.L.A. § 390.352, are appointed by the State's Governor. Finally, except in limited circumstances not relevant to this action,[25] no mention exists of a general university power to sue or be

25. M.C.L.A. § 390.381 reads:

Sec. 1. Whenever any money or property shall have been or hereafter shall be devised, bequeathed or given by any will, deed, bill of sale or other written instrument, or subject to the terms of any written instrument, to or for the use of the Michigan college of mining and technology, or its board of control, or to or for the use of any of its predecessors or successors or their respective boards of control, or to said institution or any of its predecessors and successors, or its or their respective boards of control, for the use of students, faculty members, or employes of the same, and it shall be deemed by the board of control of said institution or its successor, or by any interested person, or by any trustee or trustees under any such written instrument, necessary or desirable to have the terms, purposes or conditions of any such written instrument construed by an action or suit, or to have an accounting in court of the property so held, the then board of control of such institution or of its successor may and shall be made a party plaintiff or defendant, by its then name, to any such action or suit, and therein such board of control or its successor shall represent and act for the said college and its predecessors or successors, and their respective boards of control, and for each and all such beneficiaries not specifically designated in such instrument who may be interested in the distribution of any part of the principal or income arising from any such devise, bequest or gift; and judgment or decree in said action or suit shall be binding upon all so represented.

M.C.L.A. § 390.382 reads:

Sec. 2. Any such action or suit authorized by section 1 of this act[1] to be brought by said board of control may be instituted by

sued. For this reason, and because no state court decisions exist which intimate a view to the contrary, I conclude that MTU is an agent of the State empowered under the Eleventh Amendment to invoke sovereign immunity. I accordingly dismiss the university from this action.

*Individual Defendants as Proper Parties*

■ Turning next to the individual defendants in their official capacities, I conclude that the action against them must be dismissed insofar as it seeks monetary relief. *See, Martin v. University of Louisville, supra.* This is because a monetary award in such a case would ultimately be paid out of the state's treasury, a result violative of the Eleventh Amendment. *See, Huecker v. Milburn,* 538 F.2d 1241 (6th Cir. 1976). *Cf., Taylor v. Perini,* 503 F.2d 899 (6th Cir. 1974), *vacated on other grounds,* 421 U.S. 982, 95 S.Ct. 1985, 44 L.Ed.2d 474 (1975); *Jordon v. Gilligan,* 500 F.2d 701 (6th Cir. 1974), *cert. denied,* 421 U.S. 991, 95 S.Ct. 1996, 44 L.Ed.2d 481 (1975).[26]

■ Moreover, because Sections 1983 and 1985(3) are *in pari-materia* and should be similarly treated for purposes of determining who is and who is not a proper defendant,[27] I additionally dismiss MTU, and cross-plaintiff's demand for monetary relief against the defendants named in their official capacities, insofar as a conspiracy claim under Section 1985(3) is involved.

*Conspiracy Claim Under Section 1985(3)*

Defendants next argue cross-plaintiff has failed to properly state a claim under Section 1985(3) because, in order to establish a Section 1985 violation, cross-plaintiff must demonstrate a conspiracy between "two or more persons". However, defendants maintain, it is settled law that a corporation cannot conspire with its officers, agents or employees. *See, Dombrowski v. Dowling,* 459 F.2d 190 (7th Cir. 1972). The rationale behind the rule is that a corporation is in itself a single, legal entity and can act only by and through its officers, agents and employees. Therefore, defendants contend, university officials must reach an agreement with a person outside of the corporate body constituting the university· before cross-plaintiff can sufficiently allege a Section 1985(3) conspiracy.

In *Dombrowski, supra,* a white lawyer was purportedly denied the opportunity to rent office space after the landlord corporation discovered that many of plaintiff's clients were black or Latin American. Plaintiff thereafter sued two corporate officers under Section 1985(3) alleging that their refusal to negotiate a rental agreement amounted to an unlawful conspiracy to deny him his right to equal enjoyment of public facilities. The Seventh Circuit Court of Appeals disagreed. In reaching this conclusion, the court acknowledged that Sec-

---

authority of a vote and in the name of the board of control of the Michigan college of mining and technology, or its successor; and in any such suit where said board of control, or its successor is made a party defendant, service of process may be had upon such board of control, or its successor, by serving any process in the usual way upon the chairman or secretary of such board of control or its successor, which shall constitute full and complete service upon said board of control or its successor, and each member thereof. No death, resignation or other change in the membership of said board of control, or its successor, shall affect any such suit after the same has been instituted or service of process had as aforesaid upon such board of control or its successor.

26. Defendants do not dispute the fact that this court can order prospective, equitable relief against defendants in their official capacities

without violating the Eleventh Amendment. *See, Quern v. Jordan, supra; Ex parte Young, supra.* Further, defendants do not challenge the sufficiency of the allegations against the individually-named defendants in their individual capacities. Hence, while I dismiss the cross-claim insofar as it seeks monetary relief from defendants in their official capacities, I do not dismiss the cross-claim insofar as it seeks non-monetary, equitable relief against defendants in their official capacities, or monetary relief against the defendants in their individual capacities.

27. *See, Bosely v. City of Euclid, supra; Veres v. County of Monroe,* 364 F.Supp. 1327 (E.D. Mich.1973), *aff'd* 542 F.2d 1177 (6th Cir. 1976), *cert. denied,* 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977).

tion 1985(3) originated in the Ku Klux Klan Act of 1871,[28] and was designed to curtail obnoxious Klan activity. Nevertheless, the panel stated at 196:

We also believe that the statutory requirement that "two or more persons . . . conspire or go in disguise on the highway," is not satisfied by proof that a discriminatory business decision reflects the collective judgment of two or more executives of the same firm. We do not suggest that an agent's action within the scope of his authority will always avoid a conspiracy finding. Agents of the Klan certainly could not carry out acts of violence with impunity simply because they were acting under orders from the Grand Dragon. But if the challenged conduct is essentially a single act of discrimination by a single business entity, the fact that two or more agents participated in the decision or in the act itself will normally not constitute the conspiracy contemplated by this statute. *Cf. Morrison v. California*, 291 U.S. 82, 92, 54 S.Ct. 281, 78 L.Ed. 664. In this case we believe the evidence fails to establish this element of a § 1985(3) violation.

We therefore hold that the judgment cannot be supported under this statute.

The holding in *Dombrowski* has received wide support. *See*, e. g., *Baker v. Stuart Broadcasting Co.*, 505 F.2d 181 (8th Cir. 1974); *Cohen v. Illinois Institute of Technology*, 524 F.2d 818 (7th Cir. 1975), *cert. denied* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976). For example, in *Fallis v. Dunbar*, 386 F.Supp. 1117 (N.D.Ohio 1974), *aff'd* 532 F.2d 1061 (6th Cir. 1976), tenants of a townhouse brought suit under Sections 1983 and 1985(3) to enjoin an alleged retaliatory eviction. The district court dismissed the conspiracy aspect of plaintiffs' complaint, saying, at 1121:

Unlike an action under § 1983, an action under § 1985(3) reaches purely private actions without any requirement of state action. *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The elements for a cause of action under § 1985(3) are:

(1) existence of a conspiracy of two or more persons;

(2) the purpose of the conspiracy is to deprive a person or class of persons of equal protection of laws or privileges and immunities under the laws;

(3) an act in furtherance of the conspiracy; and

(4) injury or deprivation of the rights of plaintiff.

*Cameron v. Brock*, 473 F.2d 608, 610 (6th Cir. 1973).

A serious question exists whether there were two or more persons who conspired to deprive the plaintiffs of their civil rights.

\* \* \* \* \* \*

Given the fact that only Dunbar Real Estate Co. and its officers, employees and agents were involved in the actions complained of the Court finds that there were not "two or more persons" who conspired to deprive plaintiffs of any civil rights. A corporation exists as a person only in a legal sense; it can act and speak only through its officers, employees, and agents. The action of Roger Dunbar in deciding to evict plaintiffs and the actions of other employees and agents in carrying out that decision were within the scope of their employment by Dunbar Real Estate Co. As such, the conspiracy requirement of § 1985(3) has not been met. *See Dombrowski v. Dowling*, 459 F.2d 190, 193 (7th Cir. 1972).

A Sixth Circuit panel affirmed, per curiam. The court held that plaintiffs failed to show that more than one "person" was involved in the conspiracy.

On the other hand, the *Dombrowski* rule has been limited in several contexts, where, for example, separate corporate officers committed separate acts of discrimination against the plaintiff (*see, Rackin v. University of Pennsylvania*, 386 F.Supp. 992 (E.D. Pa.1974)), or where the alleged discrimination arose out of more than one of a corpo-

---

**28.** 17 Stat. 13.

ration's several separate offices (*see, Dupree v. Hertz Corp.*, 419 F.Supp. 764 (E.D. Pa.1976)).

The Third Circuit considered this question at length in *Novotny v. Great American Federal Savings & Loan Assoc.*, 584 F.2d 1235 (1978), *vacated on other grounds*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), a case brought under Section 1985(3) by a male employee allegedly discharged because he had charged his employer with discrimination against female employees. The Court of Appeals panel rejected defendants' motion for dismissal based upon *Dombrowski*. Instead, the court stated at 1257–1259:

> It is true that a conspiracy requires a plurality of legal personalities as one of its elements. For example, at common law a husband and wife could not conspire, since they constituted a single personality in the eyes of the law. But it is well-settled that an employer can conspire with his employee, and the Supreme Court has held that a labor union can conspire with its business agent. The assertion of the defendants must therefore be that incorporation confers on corporate employees an immunity from liability under § 1985(3).
>
> We see nothing in the policies undergirding § 1985(3) that would support such an argument. If, as seems clear under § 1985(3), the agreement of three partners to use their business to harass any blacks who register to vote constitutes an actionable conspiracy, we can perceive no function to be served by immunizing such action once a business is incorporated.

> \* \* \* \* \* \*

Similarly, the sole Supreme Court decision to shed direct light on the issue before us undercuts the defendants' position. In *Pennsylvania R.R. System & Allied Lines Fed. No. 90 v. Pennsylvania R.R. Co.*[123] [267 U.S. 203, 45 S.Ct. 307, 69 L.Ed. 574], a labor union brought suit against an employer and its officers, claiming that under the predecessor to 18 U.S.C. § 241, the actions of the corporation and officers in resisting the recommendations of an arbitration board under the Railway Labor Act constituted a conspiracy to "injure, oppress, threaten, or intimidate any person in the free exercise or enjoyment of" a federal right or privilege. The Supreme Court's opinion expressed no doubts regarding the viability of a conspiracy composed of corporate officers. Rather it stated that "The whole issue . . . is whether the provisions of Title III, in pointing out what Congress wished the parties to the dispute to do, was intended by Congress to be a positive, obligatory law . . . ."

Thus, since neither considerations of policy nor force of precedent require adherence to the defendants' stance, we do not follow the line of cases adopting the rule that concerted action among corporate officers and directors cannot constitute a conspiracy under § 1985(3). (Footnotes omitted.)

▆ I find *Novotny* to be persuasive.[29] While the *Dombrowski* rule would appear to make sense where there is a single corporate act emanating from a group decision (e. g., board of directors voting to fire employee), the rule pales where numerous and varied acts of discrimination by several persons are committed against the plaintiff. It makes no sense to immunize illegal discriminatory activity merely because the ac-

---

**29.** In footnote 11, 442 U.S., at 372, 99 S.Ct., at 2349, the Supreme Court expressly reserved a ruling on the Court of Appeals decision that a Section 1985(3) conspiracy could lie against officers of the same corporation. The Court ruled, however, that a Section 1985(3) conspiracy was impermissibly alleged where plaintiff was fired because he vocally supported female employees who were discriminated against by the corporation. While the employee's termination may have been a violation of Title VII, the Court said no *constitutional* deprivation was involved. Hence, while the defendants may have illegally conspired, the conspiracy involved in that case was not cognizable under Section 1985.

In the present case, cross-plaintiff alleges a conspiracy to deny him constitutional rights such as equal protection. Such a claim *is* cognizable under Section 1985(3) under the ruling in *Novotny*.

tivity arose in a corporate setting. Where two or more corporate officers by agreement commit different discriminatory acts against plaintiff, I believe a Section 1985(3) violation has occurred.

 In the present case, cross-plaintiff alleges a wide variety of allegedly unlawful behavior on defendants' part. Cross-plaintiff charges, for example, (1) that Smith, Stebbins and Geddes solicited complaints from Physics Department staff in order to demote the cross-plaintiff; (2) that Powers continually pressed for reorganization of the Physics Department; (3) that Stebbins and Powers encouraged members of the Physics Department to resume hostilities toward cross-plaintiff in order to justify cross-plaintiff's dismissal; (4) that cross-plaintiff's authority was undermined when defendants awarded Dr. Lee larger amounts of research and travel money than cross-plaintiff felt he deserved; etc. I find that these allegations sufficiently allege a conspiracy violative of Section 1985(3). Accordingly, I deny defendants' motion to dismiss this aspect of cross-plaintiff's cross-claim.

### Trial by Jury; Compensatory and Punitive Relief Under Sections 1983, 1985(3)

 Defendants next assert that cross-plaintiff's demand for a jury trial and for compensatory and punitive damages must be denied. Compensatory and punitive damages, defendants argue, as well as trial by jury, are available only when plaintiff has asserted a "legal" claim. Consequently, under the authority of *EEOC v. Detroit Edison, supra,* and *McFerren v. County Board of Education of Fayette County, Tennessee,* 455 F.2d 199 (6th Cir.), *cert. denied,* 407 U.S. 934, 92 S.Ct. 2461, 32 L.Ed.2d 817 (1972), defendants move to strike these demands by cross-plaintiff.

The Sixth Circuit recently spoke to these issues in *Hildebrand v. Board of Trustees of Michigan State University,* 607 F.2d 705 (1979). In that case, a discharged university professor brought suit under Sections 1983 and 1985 alleging that his employment termination unlawfully resulted from his exercise of First Amendment rights. The case was tried before a jury. However, at the close of proofs, the court, *sua sponte,* took the case away from the jury because it determined, for the same reasons maintained by the present defendants, that no jury trial right existed.

The Court of Appeals reversed. After acknowledging that claims for compensatory and punitive damages in fact are available in Section 1983 and 1985 actions, the court concluded that plaintiff's claim is a "legal" one where his demand for reinstatement (equitable relief) is coupled with a demand for compensation and punitive relief. In such a case, the Seventh Amendment to the United States Constitution[30] guarantees trial by jury.

Based upon *Hildebrand,* I deny defendants' motion to dismiss the jury trial demand in cross-plaintiff's cross-claim. Further, for reasons set out in that opinion, I likewise deny defendants' motion to dismiss cross-plaintiff's demand for compensatory and punitive relief.

### Attorney's Fees

 Defendants lastly request an award of attorney fees relating to the instant motion to dismiss. Specifically, defendants charge cross-plaintiff with bad faith due to the fact that cross-plaintiff refused to voluntarily amend his cross-claim after defendants informed cross-plaintiff of jurisdictional defects. Only after defendants filed their original motion to dismiss in 1976 did cross-plaintiff amend his cross-claim.

As defendants themselves admit, courts are extremely reluctant to award defendants attorney fees in civil rights actions. This is especially true where plaintiff's

---

**30.** Amendment 7 to the Constitution of the United States reads:

**AMENDMENT VII—CIVIL TRIALS**

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law.

**1168**

claim is arguably meritorious. *Cf., Carrion v. Yeshiva University*, 535 F.2d 722 (2nd Cir. 1976).

Cross-plaintiff's claim, however, is not patently meritless. Moreover, as the Sixth Circuit noted in *Hildebrand v. Board of Trustees of Michigan State University*, 607 F.2d 1282, 1283 (1979), to receive an attorney's fees award, plaintiff must be the prevailing party on some substantial issue before the court. This is not the present situation. For these reasons, I deny defendants' motion.

### III

In conclusion, I summarize the present posture of this case:

As to plaintiff Chai:

(1) Plaintiff's claims under 42 U.S.C. §§ 1981 and 1983 are dismissed as barred by the applicable statute of limitations.

(2) Plaintiff's requests for trial by jury and for compensatory and punitive relief are denied as not cognizable under Title VII.

As to cross-plaintiff Mandeville:

(1) Cross-plaintiff's cross-claim is dismissed insofar as it attempts to charge a due process violation based upon a deprivation of property interests.

(2) However, because I find that cross-plaintiff has sufficiently alleged a deprivation of his liberty interests, I deny defendants' motion to dismiss Count I as that count relates to an alleged due process violation.

(3) I deny defendants' motion to dismiss the cross-claim insofar as it alleges a First Amendment violation.

(4) Because I find that cross-plaintiff was an employee-at-will, I dismiss Count III of the cross-claim alleging a breach of contract.

(5) I dismiss Michigan Technological University from this case due to the existence of sovereign immunity.

(6) I dismiss cross-plaintiff's demand for monetary relief against the defendants named in their official capacities.

(7) I deny defendants' motion to dismiss, under Count II of the cross-claim, cross-plaintiff's claims of a conspiracy in violation of Section 1985(3).

(8) I deny defendants' motion to dismiss cross-plaintiff's jury demand.

(9) I deny defendants' motion to dismiss cross-plaintiff's demand for compensatory and punitive relief.

(10) I deny defendants' motion for attorney's fees.

IT IS SO ORDERED.